USCA1 Opinion

 

 January 14, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1473 THEODORE M. ELLENWOOD, ET AL., Plaintiffs, Appellees, v. EXXON SHIPPING CO., Defendant, Appellant. ____________________ STATE OF MAINE, Intervenor. _____________________ No. 92-1474 THEODORE M. ELLENWOOD, ET AL., Plaintiffs, Appellants, v. EXXON SHIPPING CO., Defendant, Appellee. ____________________ STATE OF MAINE, Intervenor. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. D. Brock Horny, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Coffin, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ ____________________ Peter Bennett with whom Daniel W. Bates was on brief for the ______________ ________________ Ellenwoods. Thomas D. Warren, Deputy Attorney General, with whom Michael E. _________________ __________ Carpenter, Attorney General, was on brief for the State of Maine. _________ Robert M. Hayes with whom Charles G. Bakaly, Jr., Richard G. ________________ ________________________ __________ Moon, and Linda D. McGill were on brief for Exxon Shipping Company. ____ _______________ ____________________ ____________________ COFFIN, Senior Circuit Judge. Shortly after the Exxon _____________________ _____ Valdez struck a reef off the Alaskan coast in 1989, defendant ______ Exxon Shipping Company adopted a new policy barring any employee who had ever participated in an alcohol rehabilitation program from holding designated jobs within the company. Pursuant to this policy, plaintiff Theodore Ellenwood, who had no connection to the Valdez incident, was removed from his position as chief ______ engineer of another Exxon oil tanker, the Exxon Wilmington. _________________ Ellenwood voluntarily had entered, and successfully had completed, a month-long alcohol rehabilitation program a year before the Valdez accident. Despite his concerns about his ______ drinking, Ellenwood never had had an on-the-job problem with alcohol. A psychiatrist who examined Ellenwood in connection with this case concluded, in fact, that he had never been an alcoholic. See Tr. Vol. V, at 133. ___ Relying primarily on the company's previous written policy that "[n]o employees with alcoholism will have their job security or future opportunities jeopardized due to a request for help or involvement in a rehabilitation effort," Ellenwood and his wife brought suit against Exxon alleging tort and contract claims as well as violations of state statutes prohibiting discrimination against the handicapped.1 Ellenwood ultimately received a ____________________ 1 The complaint set forth the following causes of action: breach of contract (Count I); breach of a duty of good faith arising out of Exxon's use of confidential information concerning Ellenwood's alcohol treatment as a basis for removing him (Count II); estoppel arising out of Exxon's representations and promises (Count III); wrongful discharge in violation of the public policy promoting responsible treatment of alcoholism (Count IV); -3- judgment for $677,648 on his contract and promissory estoppel causes of action. In these appeals, both sides contend, inter alia, that the _____ ____ district court committed legal error in defining the actionable counts. Ellenwood claims the judge eliminated too many claims on various legal grounds, depriving him of additional relief, while Exxon claims that the court allowed too many counts to be tried.2 We affirm most of the court's rulings. We conclude, however, that the district court overestimated the preemptive effects of admiralty law and the Rehabilitation Act of 1973, 29 U.S.C. 701-796, and, accordingly, we must remand for trial on Ellenwood's state statutory claims of handicap discrimination.3 ____________________ discrimination against the handicapped contrary to various state laws (Count V); misrepresentation over the career consequences of seeking alcohol treatment (Count VI); intentional and negligent infliction of emotional distress on both Ellenwoods in ending Ellenwood's career and disseminating confidential information concerning his condition (Counts VII and VIII); defamation in removing Ellenwood from his position as chief engineer (Count IX); invasion of privacy in the manner in which Exxon obtained the information about Ellenwood's treatment and disclosed it (Count X); invasion of privacy in placing Ellenwood in a false light (Count XI); invasion of privacy in publicizing confidential information (Count XII); Mrs. Ellenwood's loss of consortium (Count XIII); and punitive damages (Count XIV). 2 This court granted the State of Maine provisional permission to intervene on the issue of whether Ellenwood's claim based on the Maine Human Rights Act, 2A Me. Rev. Stat. Ann. tit. 5, 4571-72 (Supp. 1992), is preempted by federal law. 3 The complaint referred to statutes in Maine, New Jersey and Texas, and we offer no view as to the applicable law. We note, however, that the district court applied Texas law to Count XII of the complaint, which alleged an invasion of privacy. See ___ Memorandum of Decision, Oct. 28, 1991. -4- I. Preemption and the Rehabilitation Act4 _____________________________________ A. Background __________ Section 503 of the Rehabilitation Act of 1973, 29 U.S.C. 793, requires any contract with the federal government in excess of $2,500 to include a provision obligating the federal contractor to "take affirmative action to employ and advance in employment qualified individuals with handicaps." 29 U.S.C. 793(a). Any handicapped individual who believes a contractor has failed to comply with this provision may file a complaint with the Department of Labor, which must conduct an investigation and take appropriate action. 29 U.S.C. 793(b). Regulations promulgated pursuant to 503 specify a detailed administrative enforcement mechanism for its breach. See 41 C.F.R. 60-741.1- ___ 741.32 (1991). The Department's Office of Federal Contract Compliance Programs (OFCCP) is empowered, for example, to seek injunctive relief in court, terminate or cancel a contract, or bar a contractor from receiving future contracts. 41 C.F.R. 60-741.28(b)-(e) (1991). It also may seek such remedies as back pay and reinstatement for affected employees. See Dep't of Labor ___ ______________ v. Texas Indus., Inc., 47 Fair Empl. Prac. Cas. (BNA) 18, 28 ___________________ (Dep't Labor 1988). See Howard v. Uniroyal, Inc., 719 F.2d 1552, ___ ______ ______________ 1559 (11th Cir. 1983) (detailing enforcement procedures). In a motion for summary judgment, Exxon, which is a federal contractor, argued that 503 preempts virtually all of ____________________ 4 Our review of the district court's preemption decisions, which were rulings of law, is plenary. -5- Ellenwood's state law claims,5 and that Ellenwood's only recourse on matters related to his alcohol treatment is the claim he has filed with the OFCCP. The district court rejected this contention, finding no evidence that Congress intended the provision to eliminate conventional state law claims such as breach of contract, misrepresentation, defamation or infliction of emotional distress, because these claims "are in no way related to the federal Rehabilitation Act, any affirmative action clause in a government contract, or handicap discrimination." See Memorandum of Decision, Oct. 15, 1991, at 3. The court also ___ ruled, however, that 503 did preempt Count V's direct claim of discrimination on the basis of handicap in violation of various state statutes, and Count IV's common law claim that Ellenwood's discharge violated a public policy promoting responsible treatment of alcoholism. Neither party is satisfied with this Solomonic division of the claims. Accordingly, on appeal, we are asked to consider both Ellenwood's claim that the district court erred in ruling that 503 preempts Counts IV and V and Exxon's contrary assertion that the district court erred in finding that the federal statute does not preempt the contract and promissory estoppel claims on which Ellenwood received a jury verdict. The State of Maine joins Ellenwood in arguing that 503 does not preempt a claim of handicap discrimination brought under its ____________________ 5 According to Exxon, only Counts X and XII of the complaint, charging the company with obtaining and disclosing private information, survived preemption. -6- Human Rights Act, 2A Me. Rev. Stat. Ann. tit. 5, 4571-72 (Supp. 1992). We take up each plea for reversal in turn, following a brief review of the well established contours of preemption law. B. Preemption Principles _____________________ The preemption doctrine is rooted in the Supremacy Clause, which invalidates state laws that "interfere with, or are contrary to, the laws of congress." Gibbons v. Ogden, 22 U.S. (9 _______ _____ Wheat.) 1, 211 (1824). See also Cipollone v. Liggett Group, ___ ____ _________ ______________ Inc., 112 S. Ct. 2608, 2617 (1992). A court's sole task in ____ determining whether a state statute is preempted is to ascertain whether Congress intended the federal law to have such effect. California Federal Savings & Loan Ass'n v. Guerra, 479 U.S. 272, ________________________________________ ______ 280 (1987); Massachusetts Medical Society v. Dukakis, 815 F.2d ______________________________ _______ 790, 791 (1st Cir. 1987). Although Congress may articulate its intent explicitly, see, e.g., Jones v. Rath Packing Co., 430 U.S. ___ ____ _____ ________________ 519, 532 (1977), it does not always do so, and the challenge of preemption law is to identify occurrences of implied preemption. Preemption by implication may take place in different ways. First, congressional intent to preempt state law may be inferred when the scheme of federal regulation in a particular area is sufficiently pervasive and complex "to make reasonable the inference that Congress `left no room' for supplementary state regulation," California Federal Savings & Loan Ass'n, 479 ________________________________________ U.S. at 281 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. ____ ________________________ 218, 230 (1947)); see also Dukakis, 815 F.2d at 791. Second, in ___ ____ _______ areas where Congress has not entirely displaced state regulation, -7- state law will be deemed preempted to the extent it actually conflicts with federal law. Such a conflict occurs either because "`compliance with both federal and state regulations is a physical impossibility,'. . . , or because the state law stands `as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" California Federal Savings __________________________ & Loan Ass'n, 479 U.S. at 281 (quoting Florida Lime & Avocado _____________ _______________________ Growers, Inc. v. Paul, 373 U.S. 132, 142-143 (1963) and Hines v. _____________ ____ _____ Davidowitz, 312 U.S. 52, 67 (1941)). See also O'Brien v. __________ ___ ____ _______ Consolidated Rail Corp., 972 F.2d 1, 3 (1st Cir. 1992). _______________________ These alternative avenues to preemption do not mean that either route is to be chosen lightly. The Supreme Court recently reiterated the longstanding principle that "`the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [course is] the clear and manifest purpose of Congress.'" Cipollone, 112 S. Ct. at 2617 (quoting Rice, 331 _________ ____ U.S. at 230). Thus, the presumption is against preemption. Id. __ at 2618. C. Applying the Principles _______________________ 1. State handicap discrimination statutes. ______________________________________ Section 503 contains no express language regarding preemption. Our task, therefore, is to determine whether there are other indicia of Congressional intent to render state discrimination laws ineffectual against federal contractors. Exxon essentially makes a two-pronged argument. First, it cites legislative history suggesting that Congress sought a uniform -8- federal remedy for violations of 503, which would be frustrated if contractors additionally were subject to varying state laws. Thus, according to Exxon, Congress must have intended to preempt state provisions. Second, Exxon suggests that the detailed nature of the administrative scheme promulgated under 503 demonstrates Congress's intent to foreclose other types of remedies against federal contractors. Exxon maintains that, while Congress has not fully occupied the field of handicap discrimination, with respect to federal contractors, it has "`left no room' for supplementary state regulation," California Federal Savings & ______________________________ Loan Ass'n, 479 U.S. at 281. __________ In our view, what Exxon offers as proof of an intent to preempt falls short of the mark. The legislative history on which the company relies is a single passage in a Senate Committee Report relating to amendments to the Rehabilitation Act that were enacted a year after the Act itself. The amendments made no change in either sections 503 or 504 of the Act,6 but the Senate Report commented: It is intended that sections 503 and 504 be administered in such a manner that a consistent, uniform, and effective Federal approach to discrimination against handicapped persons would result. Thus, Federal agencies and departments should cooperate in developing standards and policies so that there is a uniform, consistent Federal approach to these sections. ____________________ 6 Section 504, 29 U.S.C. 794, prohibits discrimination against the handicapped in federally funded programs, the United States Postal Service, and in Executive agencies. -9- S. Rep. No. 1297, 93d Cong., 2d Sess., reprinted in 1974 _____________ U.S.C.C.A.N. 6373, 6391. Exxon claims this passage demonstrates that Congress was seeking an exclusive approach to handicap discrimination by federal contractors, and that, consequently, it must have intended 503 to displace parallel state laws governing the same conduct. Even without regard for the lesser weight accorded this subsequent history than would be accorded contemporaneous legislative comments, see Heckler v. Turner, 470 U.S. 184, 209 ___ _______ ______ (1985), we believe Exxon has read far too much into the quoted remarks. We are persuaded that the passage in no way implicates state law but instead reflects Congress's concern about the lack of coordination on the federal level between the two agencies _______________________ responsible for implementing sections 503 and 504. The Senate Report continues from the portion quoted above to elaborate on the agencies' relationship: The Secretary of the Department of Health, Education, and Welfare, because of that Department's experience in dealing with handicapped persons and with the elimination of discrimination in other areas, should assume responsibility for coordinating the section 504 enforcement effort and for establishing a coordinating mechanism with the Secretary of the Department of Labor to ensure a consistent approach to the implementation of sections 503 and 504. S. Rep. No. 1297, 93rd Cong., 2d Sess., reprinted in 1974 ____________ U.S.C.C.A.N. 6373, 6391. In our view, Congress was calling for a more uniform and consistent "Federal approach to discrimination _______ against handicapped persons," id. (emphasis added); nothing in __ -10- the passage indicates that it was seeking to eliminate any role for state law. See D'Amato v. Wisconsin Gas Co., 760 F.2d 1474, ___ _______ _________________ 1482 (7th Cir. 1985) (by insisting on coordination, Congress was directing "that the two responsible agencies were not to work at cross purposes or to duplicate each other's efforts") (citation omitted). Exxon's second basis for inferring an intent to preempt -- the comprehensive and detailed regulations promulgated under 503 -- is equally unavailing. The fact that Congress has implemented an extensive regulatory scheme in a particular area does not lead necessarily to the conclusion that it intended to displace parallel state remedies. As the Supreme Court stated in Hillsborough County v. Automated Medical Laboratories, Inc., 471 ____________________ ____________________________________ U.S. 707, 716-18 (1985): To infer pre-emption whenever [a federal agency] deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive. Such a rule . . . would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence. See also R.J. Reynolds Tobacco Co. v. Durham County, 479 U.S. ___ ____ ___________________________ ______________ 130, 149 (1986) (preemption should not be inferred simply because federal agency's regulations are comprehensive). Exxon cites nothing in the state provisions that would make compliance with both state law and the detailed 503 scheme a "physical impossibility," Florida Avocado & Lime Growers, 373 U.S. at 143, _______________________________ and, in the absence of other evidence of preemptive intent, there is no basis for displacing the state law. -11- In accepting Exxon's argument that Congress intended to preempt state anti-discrimination remedies against federal contractors, the district court relied entirely on the analysis of the Eleventh Circuit in Howard v. Uniroyal, Inc., 719 F.2d ______ _______________ 1552 (1983). In Howard, the plaintiff had alleged a claim under ______ Alabama law as a third party beneficiary of the 503 affirmative action clause contained in contracts between his employer and the federal government. The Eleventh Circuit rejected this claim. It held that state contract remedies could not be used to enforce 503 essentially for the reasons Exxon has offered to us in support of its preemption argument. Emphasizing the Senate Report's reference to federal uniformity and the comprehensiveness of the 503 administrative scheme, the Howard court found it ______ "reasonable to infer that Congress left no room in section 503(b) for state contract actions to supplement it," id. at 1559. The __ court concluded that allowing the plaintiff to broaden enforcement of the affirmative action clause by means of state law could frustrate directly the specific scheme designed by Congress, allowing a private claim through the back door that couldn't come through the front door. An inference of preemption was further warranted, the court held, because Congress's substantial interest in enforcing the affirmative action clause -- determining appropriate terms, conditions and remedies -- was "more substantial" than the -12- state's interest in providing a remedy for third party beneficiaries seeking to enforce the same clause. Id. at 1561. __ We believe Exxon and the district court have relied unwisely on Howard, which differs from this case in a crucial respect. ______ There, the plaintiff sought to use state law to enforce 503 itself; the court ruled that Congress intended the federal administrative remedy to be the plaintiff's sole means of enforcing the affirmative action clause. Here, however, Ellenwood is seeking to enforce not 503, but independent obligations created by state anti-discrimination statutes. The claim in this case does not threaten the uniformity of __________ the 503 system. Rather, the issue here is one of compatibility, specifically, whether there is any basis for _____________ inferring that Congress believed an independent state remedy could not co-exist with the 503 system. Howard is not helpful ______ in this context. In the employment discrimination field, Congressional enactments "have long evinced a general intent to accord parallel or overlapping remedies against discrimination." Alexander v. Gardner-Denver Co., 415 U.S. 36, 47 (1974). See _________ ___________________ ___ also California Federal Savings & Loan, 479 U.S. at 282-83; ____ ___________________________________ Kremer v. Chemical Construction Corp., 456 U.S. 461, 468-69 ______ ____________________________ (1982); Muncy v. Norfolk and Western Railway Co., 650 F. Supp. _____ ________________________________ 641, 644 (S.D.W. Va. 1986) (ruling that 503 does not preempt state human rights act). Nothing in 503, which is focused narrowly on the contractual requirement for an affirmative action -13- clause, provides a basis to infer a departure from that traditional approach. In addition, several references in 503's legislative history suggest that, rather than seeking to preempt state law through comprehensive legislation, Congressional leaders recognized that the federal statute was a modest one: "We are just beginning to do too little as the dimension of the problem grows in geometric proportion." Congressman Vanik, Congressional Record - - House 18137 (June 5, 1973); "[W]e have only begun to scratch the surface in meeting the needs of our disabled fellow citizens." Congressman Brademus [sic], Congressional Record -- House 30149 (September 18, 1973); "I do not consider [this bill] to be a perfect bill, or in all honesty, even an adequate bill." Senator Randolph, Congressional Record -- Senate 34586 (July 18, 1973).7 Raytheon Co. v. Fair Employment and Hous. Comm'n, 46 Fair Empl. ____________ _________________________________ Prac. Cas. (BNA) 1089, 1099 (Cal. Sup. Ct. 1988), aff'd, 212 Cal. _____ App. 3d 1242, 261 Cal. Rptr. 197 (2d Dist. 1989). A year later, in the Rehabilitation Act Amendments of 1974, Congress added a provision requiring state agencies that administer programs funded under the Act to take affirmative action to employ and advance qualified handicapped individuals who are covered under 503. See Senate Report No. 1297, ___ reprinted in 1974 U.S.C.C.A.N., at 6391-92. The Senate Committee ____________ Report noted that these agencies "are expected to adopt strong affirmative action programs which are at least equivalent to _________ those now being developed for Federal agencies." Id. at 6392 __ ____________________ 7 Both Congressman Brademas and Senator Randolph were among the managers of the legislation. See Conf. Rep. No. 500, 93rd ___ Cong., 1st Sess., reprinted in 1973 U.S.C.C.A.N. 2143, 2154. ____________ -14- (emphasis added). These comments, although referring to administering agencies rather than federal contractors, nevertheless suggest that Congress both acknowledged the role played by states in the area of handicap discrimination and assumed that states might choose to provide different -- greater -- protection than that afforded by the federal government. See ___ Raytheon, 46 Fair Empl. Prac. Cas., at 1099.8 ________ Finally, we note that, in the recent Americans with Disabilities Act of 1990, 42 U.S.C. 12101-12213, which amended the Rehabilitation Act and extended remedies for handicap discrimination against many more private employers, Congress stated explicitly that the legislation did not "limit the remedies, rights, and procedures of any . . . law of any State . . . or jurisdiction that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter." 42 U.S.C. 12201(b). While this provision obviously can have no effect on our view of Congressional intent in 1973, it is a particularly pertinent example of Congress's historical practice of allowing overlapping remedies for employment discrimination.9 ____________________ 8 We ackowledge that this post-enactment legislative history is of less weight than contemporary commentary, but it is nevertheless of some significance. See, e.g., Heckler, 470 U.S. ___ ____ _______ at 209; Cannon v. University of Chicago, 441 U.S. 677, 686-687, ______ _____________________ n.7 (1979). 9 The absence of a provision disclaiming preemption from the Rehabilitation Act of 1973 does not demonstrate, in the absence of other evidence, an intent to foreclose state remedies. Because of its far more comprehensive reach, the ADA is likely to have appeared more preemptive than the earlier legisation. -15- Exxon attempts to distance this case from the tradition of overlapping remedies in two ways. First, it asserts that Congress has a unique interest in regulating federal contractors and, second, it claims that the area of handicap discrimination requires an extraordinary balancing of competing interests that distinguishes it from other types of employment discrimination, such as those involving race, gender or age. In the handicap discrimination field, Exxon maintains, the possibility of conflicting judgments is much greater because courts in different jurisdictions could reach widely disparate conclusions on such basic questions as what constitutes a "handicap" and which handicapped persons are "qualified" to hold particular positions. Restricting individuals to their 503 remedy would ensure that a federal contractor doing business in more than one state would face uniform obligations nationwide. We think it unlikely that Congress has a special interest in immunizing federal contractors from obligations otherwise applicable to them under state handicap discrimination statutes. These companies may do only $2,500 in business with the federal government, with the bulk of their enterprise devoted to commerce within a single state. This division gives the state a substantial interest in protecting the employment interests of its handicapped citizens. The developing nature of the issues raised in the field of handicap discrimination strikes us as ____________________ Congress evidently made the sensible decision to avoid confusion by including an express provision. -16- insufficient justification for excusing these employers from obligations imposed on others who differ only in that the federal government is not one of their customers. Moreover, Exxon's obligation is not simply to identify reasons why Congress might have departed from its usual practice, but to demonstrate a reasonable basis for inferring that Congress did, in fact, intend to make the federal remedy exclusive in this single area of employment discrimination law. Exxon has offered nothing from which we can discern such an intent. In sum, we find no "clear and manifest" intent on the part of Congress to preempt state handicap discrimination claims against federal contractors. Indeed, we find no signals of such an intent.10 2. Contract and promissory estoppel. ________________________________ In its appeal, Exxon contends that the district court should have extended its 503 preemption ruling to Ellenwood's contract and promissory estoppel claims as well. Exxon points out that these claims allege that the company breached an agreement or promise not to discriminate on the basis of Ellenwood's "handicap" of alcohol abuse. Again relying solely on the uniformity rationale, Exxon argues that all state claims based on the same assertedly discriminatory conduct are foreclosed by 503. ____________________ 10 Our preemption analysis applies as well to Ellenwood's claim for wrongful discharge based on public policy. We offer no view, however, as to whether such a claim exists under the applicable state law. -17- Our ruling on the statutory claims also is dispositive here. We note, however, one instance in which a contract claim based on statements in a company policy manual may be preempted by 503. Regulations promulgated under the statute require employers to post notices of their Rehabilitation Act obligations and of employee rights under 503 in "conspicuous places." See 41 ___ C.F.R. 60-741.4(d). If an employer included such a notice in its policy manual solely to comply with this regulation, a state contract claim based on a breach of the manual provision arguably would be preempted by the federal law. See Arellano v. Amax Coal ___ ________ _________ Co., 56 Fair Empl. Prac. Cas. (BNA) 1519, 1524-25 (D. Wy. 1991). ___ Such a claim, though in the guise of a contract claim based on the manual, would seem no different from one directly asserting a breach of 503. A direct claim under 503 unquestionably would be preempted for the reasons set out in Howard. ______ Exxon does not contend that the statements at issue here were required by 503. Indeed, such a contention would be patently unsupportable. Ellenwood's contract and estoppel claims are not premised on a general notice of Exxon's affirmative action obligations toward handicapped individuals, but on a very specific written assurance from the company that it would not disadvantage employees for seeking treatment for alcoholism. We therefore hold that the district court correctly determined that Ellenwood's contract and estoppel claims were not preempted by 503. -18- II. The Role of Admiralty Law _________________________ Our conclusion that 503 does not preempt Ellenwood's state statutory and common law claims does not end our inquiry into whether those claims are foreclosed by federal law. Exxon also contends that, even if 503 does not preempt them, maritime law does. We consider this contention first as to the state statutes and second as to the contract and estoppel claims. A. State handicap discrimination statutes. ______________________________________ In a brief footnote, the district court observed that, even if it had erred in its judgment about 503 preemption, the state handicap discrimination claims nevertheless would be foreclosed because maritime law, rather than state law, governs all issues surrounding Ellenwood's employment as a chief engineer on board ship. The court stated that, "I am not aware of any basis under maritime law for such a recovery." Memorandum of Decision, Oct. 15, 1991, at 4 n.3. The district court underestimated the role state law plays in maritime cases. Supreme Court cases make it clear that courts in admiralty cases may reach beyond maritime precedents and apply state laws "absent a clear conflict with the federal [maritime] law," Askew v. American Waterways Operators, Inc., 411 U.S. 325, _____ __________________________________ 341 (1973). See also Romero v. International Terminal Co., 358 ___ ____ ______ ___________________________ U.S. 354, 373-75, 378, n.42 (1959); Just v. Chambers, 312 U.S. ____ ________ 383, 391 (1941); Lyon v. Ranger III, 858 F.2d 22, 27 (1st Cir. ____ ___________ 1988); 1 S. Friedell, Benedict on Admiralty 112, at 7-36 (7th ______________________ ed. 1991); 14 C. Wright, A. Miller & E. Cooper, Federal Practice ________________ -19- and Procedure (hereafter Wright & Miller) 3672, at 441-444 _____________ _________________ (1985). Exxon contends that this is a case of conflict. It asserts that applying state non-discrimination statutes in an admiralty case will contravene federal maritime law by undermining that "most fundamental and long established characteristic of maritime law: the need for `harmony and uniformity' of that law." Exxon Brief at 21 (quoting Southern Pacific Co. v. Jensen, 244 U.S. _____________________ ______ 205, 216 (1917)). See also Miles v. Apex Marine Corp., 111 S. ___ ____ _____ __________________ Ct. 317, 322-23 (1990) (noting "`the constitutionally based principle that federal admiralty law should be "a system of law coextensive with, and operating uniformly in, the whole country"'") (quoting Moragne v. States Marine Lines, Inc., 398 _______ __________________________ U.S. 375, 398 (1970) (quoting The Lottawanna, 21 Wall. 558, 575 ______________ (1875))); Carey v. Bahama Cruise Lines, 864 F.2d 201, 207 (1st _____ ____________________ Cir. 1988). Once again, however, Exxon heralds the need for uniformity without an appreciation for the boundaries of its relevance. All state laws, if given effect in admiralty cases, will interfere to a degree with the uniformity of admiralty law. See 1 Benedict on ___ ___________ Admiralty 112, at 7-36. But when Congress established a _________ separate admiralty jurisdiction and empowered the judiciary to develop substantive maritime principles for use nationwide, 14 Wright & Miller 3671, it simultaneously assured that state law ________________ would continue to play some role in maritime affairs through the -20- "saving to suitors" clause.11 This provision allows plaintiffs to pursue, in addition to maritime relief, ordinary civil remedies provided by state law, so long as they do not conflict with the national substantive maritime law. See 14 Wright & ___ Miller 3672, at 440-444. Through the years, the Supreme Court has confirmed that "[t]he State and Federal Governments jointly exert regulatory powers" in maritime matters, Romero, 358 U.S. at 374, and it is ______ by now well established that state law is displaced only when it materially prejudices "the characteristic features of maritime law," 1 Benedict on Admiralty 112, at 7-36. As we observed in _____________________ Carey, "the Supreme Court . . . no longer construes the Admiralty _____ Clause as requiring `rigid national uniformity in maritime legislation.'" 864 F.2d at 207 (citation omitted). See also Lyon ___ ____ ____ v. Ranger III, 858 F.2d at 27; G. Gilmore & C. Black, The Law of __________ ___________ Admiralty, at 49-50 (2d ed. 1975). In other words, a state law _________ claim should not be dismissed simply because it would result in differing remedies for plaintiffs in different parts of the country; such a claim is foreclosed only if the state law in question frustrates a fundamental tenet of admiralty law. See ___ ____________________ 11 The Judiciary Act of 1789 granted the federal trial courts "exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction," but also reserved to "suitors, in all cases, the right of a common law remedy, where the common law is competent to give it." See Southern Pacific ___ ________________ Co., 244 U.S. at 215-216. In its present form, see 28 U.S.C. ___ ___ 1333(1), the clause gives the district courts original jurisdiction, "exclusive of the courts of the States," of: "Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." -21- Steelmet, Inc. v. Caribe Towing Corp., 779 F.2d 1485, 1488 (11th _______________ ___________________ Cir. 1986). For example, in Carey, 864 F.2d at 207, we held that a _____ Massachusetts rule barring tort recovery when a plaintiff is more than 50 percent negligent could not be applied in a maritime case because "[o]ne of the essential and longstanding features of substantive admiralty law is that contributory negligence can be considered only in mitigation of damages." The rule wholly foreclosing recovery is "`completely incompatible' with modern admiralty practice." Id. (quoting Pope & Talbot, Inc. v. Hawn, __ ___________________ ____ 346 U.S. 406, 409 (1953)). Although the rule barring state claims only if they directly conflict with basic maritime principles often requires "a delicate accommodation of federal and state interests," Carey, _____ 864 F.2d at 207, we have been shown nothing in substantive maritime law that is even potentially at odds with state human rights statutes such as those underlying Count IV of Ellenwood's complaint. Congress's only legislation in the area of handicapped rights has not been directed at maritime cases and, as discussed supra, its legislation did not preempt state _____ remedies. We find no indications that the absence of substantive maritime law governing issues concerning individuals with handicaps reflects a federal interest in protecting maritime employers from such obligations. See 1 Benedict on Admiralty ___ ______________________ 112, at 7-37. To the contrary, the Rehabilitation Act's -22- applicability to maritime employers demonstrates federal approval of such obligations. Thus, the district court's observation that maritime law has not addressed handicap discrimination specifically is not a reason to dismiss the state claim but a basis upon which to give effect to the state provisions. Maritime law historically has appreciated the leading role of state statutes in creating additional bases of recovery. In maritime wrongful death cases, for example, remedies first were provided solely under state law. See Miles, 111 S. Ct. at 320-23; Moragne v. States Marine Lines, ___ _____ _______ ____________________ Inc., 398 U.S. 375, 397 (1970). When Congress enacted maritime ____ wrongful death legislation in 1920, it provided remedies only where state law did not. Miles, 111 S. Ct. at 321; Moragne, 398 _____ _______ U.S. at 397-98. State statutes continued to play a primary role for another fifty years, until the Supreme Court created a general maritime cause of action for wrongful death. See Miles, ___ _____ 111 S. Ct. at 321-323; Moragne, 398 U.S. at 398-402.12 _______ In its reply brief, the State of Maine notes a possible concern that strict state standards regarding employment of the handicapped would conflict with the maritime doctrine of seaworthiness. The State emphasizes, however, that under its law, any legitimate physical requirements for crew members under ____________________ 12 Even today, plaintiffs may invoke state wrongful death statutes under the saving clause insofar as they involve accidents in territorial waters and do not conflict with the substantive principles developed under the maritime wrongful death doctrine. See Offshore Logistics, Inc. v. Tallentire, 477 ___ ________________________ __________ U.S. 207, 227 (1986). -23- the seaworthiness doctrine would constitute bona fide occupational requirements that would provide a defense to claims brought under the statute. See 2A Me. Rev. Stat. Ann. tit. 5, ___ 4572(1) (Supp. 1992). Of course, whether or not a state's statute specifically included such a defensive provision, vessel owners obviously could not be held liable for damages under state anti-discrimination laws when federal maritime principles required the employer to make the contested employment decision. In that narrow way, maritime law would be preemptive. As a general matter, however, we conclude that state human rights statutes may be applied in maritime cases. Indeed, it would be anomalous for maritime law, which has always shown "a special solicitude for the welfare of seamen and their families," Miles, 111 S. Ct. at 327, to reject such an employee-sensitive _____ provision. See also Smith v. Atlas Off-Shore Boat Serv., Inc., ___ ____ _____ _________________________________ 653 F.2d 1057, 1063 (5th Cir. Unit A 1981) (noting "the admiralty court's protective attitude towards the seaman). "`[C]ertainly it better becomes the humane and liberal character of proceedings in admiralty to give than to withhold the remedy.'" Miles, 111 _____ S. Ct. at 327 (quoting Moragne, 398 U.S. at 387 (quoting Chief _______ Justice Chase in The Sea Gull, 21 F. Cas. 909, 910 (No. 12,578) ____________ (CC Md. 1865))). See also Austin v. Unarco Industries, Inc., 705 ___ ____ ______ _______________________ F.2d 1, 6 n.1 (1st Cir. 1983) (state law "is generally referred to only when it affords greater protection to maritime employees than that afforded by admiralty law"). B. Contract and promissory estoppel. ________________________________ -24- Exxon contends that, in allowing the jury to consider Ellenwood's contract and estoppel claims, the district court improperly created an exception to the well-established rule that maritime employment is terminable at will by either party in the absence of a contract setting a specific term. According to Exxon, maritime law has "clung tenaciously" to the at-will principle, and only one narrow exception previously has been carved from it. In Atlas Off-Shore Boat Serv., 653 F.2d at 1062- __________________________ 63, the court permitted a claim for wrongful discharge when a seaman was fired for filing a personal injury claim that he was entitled to file by statute. No additional exceptions should be allowed to erode the strength of the at-will doctrine, Exxon argues, since the seaman's rights as an employee already are well protected by federal statute. See generally, e.g., 46 U.S.C. ___ _________ ____ 10302, 10303, 10313, 10502, 10504, 10505, 10506 (prescribing procedures governing meals, hours and wages for seamen). Exxon misperceives the district court's ruling. The court did not devise a new "wrongful discharge" cause of action on behalf of Ellenwood. It simply recognized the obvious fact that -- notwithstanding the general rule that a seaman's employment is at-will -- a maritime employer may make a contractual agreement with, or an enforceable promise to, its employees. In this case, Ellenwood claimed that Exxon had promised that his job security and future opportunities would not be jeopardized if he sought treatment for alcoholism. The jury found that the requirements for establishing a binding obligation -25- were met. We see no reason why maritime law would invalidate this self-imposed obligation.13 Accordingly, we affirm the district court's judgment on the breach of contract and estoppel claims. See infra Section V. ___ _____ III. Negligent Infliction of Emotional Distress __________________________________________ The jury awarded Theodore Ellenwood $50,000 and his wife $25,000 on their claims for negligent infliction of emotional distress. The district court overturned these verdicts on the ground that maritime plaintiffs may not recover for negligently caused emotional damages unless they demonstrate accompanying physical injury or impact.14 The Ellenwoods presented no evidence of physical harm. In granting judgment for defendants, the district court noted that the Supreme Court in Atchison, Topeka and Santa Fe Ry. _________________________________ ____________________ 13 Exxon does not argue that the district court improperly instructed the jury on the elements necessary to establish a contract or promissory estoppel claim in these circumstances, and we therefore do not delve into this issue. See, e.g., Pearson v. ___ ____ _______ John Hancock Mutual Life Ins. Co., No. 92-1684, slip op. (1st ___________________________________ Cir. Nov. 10, 1992) (discussing factors necessary to establish contract based on employee manual). We do note that, as Exxon recognizes in its reply brief, a contract must be "reasonably certain" to be enforceable. See ___ Restatement (Second) of Contracts 33 (1981). An estoppel claim _________________________________ similarly must be supported by a sufficiently definite promise. See Santoni v. Federal Deposit Ins. Corp., 677 F.2d 174, 178-79 ___ _______ ___________________________ (1st Cir. 1982). Exxon does not -- and, in our view, cannot reasonably -- argue that its policy statement assuring no adverse consequences based on alcoholism treatment is insufficiently definite to support a contract or estoppel claim. 14 The court very prudently allowed the claims to go to the jury, thus foreclosing the possibility of a later heavy investment of time and expense in the event that it should render a judgment notwithstanding the verdict and that we would disagree. -26- Co. v. Buell, 480 U.S. 557, 568 (1987), had raised the ___ _____ possibility of recovery for purely emotional injury in cases such as this one.15 The court recognized, however, that our circuit has had no opportunity since Buell to consider the issue. See _____ ___ Moody v. Maine Cent. Ry. Co., 823 F.2d 693, 694 (1st Cir. 1987) _____ ____________________ (declining to consider physical injury requirement because plaintiff failed to show causation). It therefore relied on our decision in Bullard v. Central Vermont Ry., 565 F.2d 193, 197 _______ ____________________ (1st Cir. 1977), to hold that a physical injury is a prerequisite for recovery of emotional distress damages.16 In the aftermath of Buell, recovery for wholly emotional _____ injury under the Jones Act and FELA has become an "important and recurring issue" of federal law. Ray v. Consolidated Rail Corp., ___ _______________________ 112 S. Ct. 914 (1992) (White, J., dissenting from denial of certiorari).17 The circuits vary in their treatment of such claims. See, e.g., Ray v. Consolidated Rail Corp., 938 F.2d 704, ___ ____ ___ _______________________ 705 (7th Cir. 1991) (no recovery under FELA unless injury results ____________________ 15 Buell involved a claim brought under the Federal _____ Employers Liability Act (FELA), 45 U.S.C. 51-60, which creates a negligence cause of action for railroad workers against their employers. The Jones Act, 46 U.S.C. App. 688, creates the same cause of action for seamen, and incorporates by reference the FELA. Caselaw developed under both statutes guides subsequent interpretation of either of them. See Mitchell v. Trawler Racer, ___ ________ ______________ Inc., 362 U.S. 539, 547 (1960); Gaston v. Flowers Transp., 866 ____ ______ _______________ F.2d 816, 817 (5th Cir. 1989). 16 Recovery for wholly emotional injuries was not at issue in Bullard because the plaintiff also had injured his foot. See _______ ___ 565 F.2d at 197 & n.3. 17 Ray was, in fact, an FELA case, but, as noted earlier, ___ see supra note 15, FELA jurisprudence applies to Jones Act cases. ___ _____ -27- from physical contact or threat of physical contact); Taylor v. ______ Burlington Northern R.R. Co., 787 F.2d 1309, 1313 (9th Cir. 1986) ____________________________ (claims for wholly mental injury are cognizable); Holliday v. ________ Consolidated Rail Corp., 914 F.2d 421, 426-27 (3d Cir. 1990) ________________________ (rejecting specific claim, but suggesting that, under the right circumstances, emotional distress damages may be recoverable); Gaston v. Flowers Transp., 866 F.2d 816, 821 (5th Cir. 1989) ______ ________________ (same).18 On appeal, plaintiffs urge us to hold explicitly that a seaman may recover emotional distress damages without showing a physical injury. Resolving this issue requires not only careful analysis of the specific facts of the case at hand, but also a review of common law jurisprudence and policy considerations. Buell, 480 U.S. at 568-70. As the Supreme Court noted in Buell, _____ _____ state court decisions reveal a number of "doctrinal divergences" concerning intentional and negligent infliction of emotional distress. Id. at 569-70. The Court therefore theorized that __ recovery for emotional injury "might rest on a variety of subtle and intricate distinctions related to the nature of the injury and the character of the tortious activity." Id. at 568. It __ ____________________ 18 In Plaisance v. Texaco, Inc., 937 F.2d 1004, 1009 (5th _________ _____________ Cir. 1991), a divided panel of the Fifth Circuit announced a broad rule permitting recovery for negligently caused emotional injury, but denied recovery in the instant case because the accident was so unexceptional that the significant emotional injury sustained by a tugboat captain was not reasonably foreseeable. Subsequently, in an en banc ruling, the circuit __ ____ affirmed the denial of recovery but withdrew the broad ruling of law. 966 F.2d 166 (1992). The Supreme Court denied certiorari. See 61 U.S.L.W. 3400 (U.S. Nov. 30, 1992). ___ -28- concluded its discussion by cautioning that, in this area of law, "broad pronouncements . . . may have to bow to the precise application of developing legal principles to the particular facts at hand." Id. at 570. __ Because the Ellenwoods have failed to present their claims of negligence with particularity, this is not an appropriate case in which to undertake such a substantial inquiry. Counts VII and VIII of the complaint, in the words of the district court, alleged "intentional and negligent infliction of emotional distress on both Mr. and Mrs. Ellenwood in ending Ellenwood's career and disseminating confidential information concerning his condition." Memorandum of Decision, Oct. 15, 1991, at 2. Neither the complaint nor the Ellenwoods' briefs, however, specifically identifies the negligent acts of commission or omission.19 In closing argument, plaintiffs' counsel referred in one sentence, in conclusory terms, to the negligent infliction claim.20 ____________________ 19 For example, was the alleged breach of contract the asserted negligent action? Or was it the manner in which the new policy was devised? or communicated? or applied? Was the disclosure of Ted Ellenwood's alcohol treatment negligent? If so, how? Instead of specifically identifying the allegedly unreasonable conduct that constituted a breach of duty, plaintiffs apparently assumed that we could, and would, discern from the underlying facts one or more bases for their negligence claims. This approach dates back to plaintiffs' complaint, where they simply incorporated by reference the factual background underlying the other causes of action to support the negligence claims. See Complaint at 88-90. ___ 20 Following lengthy discussions of the contract, promissory estoppel and intentional infliction of emotional distress claims, counsel stated: -29- The lack of attention devoted to this claim is further illustrated by plaintiffs' assertion that Ted Ellenwood's negligence cause of action was brought under general maritime law, not the Jones Act. See, e.g., Tr. Vol. XII, at 7. In fact, ___ ____ the Jones Act provides the exclusive recovery in negligence for claims by seamen against their employers. See Miles v. Apex ___ _____ ____ Marine, 111 S. Ct. 317, 324 (1990) (Jones Act was a response to ______ The Osceola, 189 U.S. 158 (1903), which established that seamen ___________ could recover under general maritime law for injuries resulting from unseaworthiness but not negligence); Beltia v. Sidney Torres ______ _____________ Marine Transport, Inc., 701 F.2d 491, 493 (5th Cir. 1983) (Jones _______________________ Act is "the sole basis upon which a seaman or his beneficiaries may sue his employer for negligence") (citation omitted). ____________________ I suggest to you that even if you don't find outrageousness [an element of the intentional infliction tort], you should still return a verdict of negligent infliction of mental distress. I feel, however, very strongly that intentional infliction of emotional distress has been shown because of this policy itself and the actions Exxon Shipping Company took against him deliberately after this policy came into effect. Tr. Vol. XI, at 98. The court's instructions on the negligence count also were framed broadly. The court told the jury that the plaintiff must prove that (1) Exxon acted or failed to act as "a reasonably prudent corporation would act in the management of its affairs;" (2) that "severe emotional distress" to plaintiffs was foreseeable; and (3) that plaintiffs suffered such distress as a result of negligence. See Tr. Vol. XI, at 47. ___ -30- Ellenwood's general maritime cause of action could be dismissed for that reason alone.21 The Supreme Court in Buell only speculated that some claims _____ for purely emotional injury may be brought under the FELA. See ___ Moody, 823 F.2d at 694 (door to recovery only "somewhat ajar"). _____ Conducting the particularized review needed to evaluate such a claim here would require a detailed examination of Exxon's assertedly negligent conduct, its context, and its impact on the Ellenwoods. Arguably, even in a routine case, it would be inappropriate for us to construct a theory of negligence so that we could analyze a claim of apparently little importance to the plaintiffs. A fortiori, we would be ill-advised to do so here, ___________ where we are asked to take a precedential step with a highly circumscribed license from the Supreme Court.22 ____________________ 21 Although Mrs. Ellenwood's claim arises under general maritime law, the limitations on recovery contained in the Jones Act nonetheless are relevant because her claim is based on assertedly negligent conduct governed by the statute. See ___ generally Miles v. Apex Marine, 111 S. Ct. at 327 ("We sail in _________ _____ ___________ occupied waters. Maritime tort law is now dominated by federal statute . . . ."). 22 We note that the viability of emotional distress claims based on management policy decisions and other day-to-day interactions between employees and employers is a particularly sensitive matter. See, e.g., Holliday v. Consolidated Rail ___ ____ ________ __________________ Corp., 914 F.2d 421, 425, 427 (3d Cir. 1990); Lancaster v. _____ _________ Norfolk and Western Ry. Co., 773 F.2d 807, 813 (7th Cir. 1985); ___________________________ Puthe v. Exxon Shipping Co., No. 89-CV-1619, 1992 U.S. Dist. _____ ___________________ LEXIS 14950, at *33-34 (E.D.N.Y. Sept. 26, 1992). Additionally, we question whether a case such as this, whose dominant claim is that the defendant intentionally reneged on a promise, presents the sort of tortious conduct properly compensable under the Jones Act. -31- We decline to explore the frontiers of the negligent infliction tort in these circumstances. Accordingly, the district court's judgment vacating the Ellenwoods' damage awards is affirmed.23 IV. Punitive Damages ________________ The Ellenwoods contend that the district court erred in refusing to submit their punitive damages claim to the jury. This argument faces a threshold barrier because the Ellenwoods have prevailed so far only on contractual claims, which ordinarily do not support an award of punitive damages. See ___ Restatement (Second) of Contracts 355 (1981)24; Thyssen, Inc. __________________________________ _____________ v. S.S. Fortune Star, 777 F.2d 57, 62-63 (2d Cir. 1985). See __________________ ___ generally Molzof v. United States, 112 S. Ct. 711, 715 (1992) _________ ______ _____________ (noting common law understanding that punitive damages were awarded "to punish defendants for torts committed with fraud, _____ actual malice, violence, or oppression") (emphasis added). ____________________ 23 We find no merit in plaintiffs' assertions of error concerning their claims for intentional infliction of emotional distress. The instructions accurately reflected prevailing law, see Restatement (Second) of Torts 46 cmt. d, and the court's ___ ______________________________ evidentiary decisions fell well within its broad discretion, see ___ Harrison v. Sears, Roebuck and Co., No. 92-1055, slip op. at 6-7 ________ ______________________ (1st Cir. Dec. 9, 1992) (expert testimony); Elgabri v. Lekas, 964 _______ _____ F.2d 1255, 1261 (1st Cir. 1992) (Rule 403). 24 This provision states: Punitive damages are not recoverable for a breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable. -32- Despite the general principle, the Ellenwoods contend that an award of punitive damages is permissible here because their claim involved breach of a non-contractual legal duty not to discriminate on the basis of a perceived handicap and, consequently, contractual limitations on damages are inapplicable. See Reply Brief at 22. They seek support from our ___ decision upholding punitive damages for a shipowner's willful and callous withholding of a seaman's maintenance and cure in Robinson v. Pocahontas, Inc., 477 F.2d 1048, 1051-52 (1st Cir. ________ ________________ 1973). There, we emphasized the Supreme Court's statement in Vaughan v. Atkinson, 369 U.S. 527, 532 (1962), that _______ ________ "[m]aintenance and cure differs from rights normally classified as contractual" because "the duty to provide maintenance and cure `is imposed by the law itself as one annexed to the employment.'" Robinson, 477 F.2d at 1052 (citation in Vaughan omitted). ________ _______ This argument assumes that the Ellenwoods proved more than a breach of contract. They have not. In Robinson, punitive ________ damages were permissible because the "`[t]he duty to provide maintenance and cure is in no real sense contractual, and a suit for failure to provide maintenance or cure can hardly be equated, therefore, with an action for breach of contract,'" 477 F.2d at 1052 n.3 (quoting Vaughan, 369 U.S. at 534 (Stewart, J., _______ dissenting)). Ellenwood's proven breach of contract and promissory estoppel claims did not arise from a duty "imposed by the law itself," Robinson, 477 F.2d at 1052, but from Exxon's ________ self-imposed obligation not to jeopardize the job security or -33- future opportunities of employees who sought treatment for alcoholism. The Ellenwoods have cited no maritime decision awarding punitive damages for breach of this type of contractual obligation. See Thyssen, Inc., 777 F.2d at 62 (no case found in ___ _____________ which admiralty court awarded punitive damages for breach of contract). We are aware of a recent trend to permit punitive damages in the contract setting in a narrow range of circumstances. See 5 ___ A. Corbin, Corbin on Contracts 1077 (1964 and Supp. 1992). ____________________ This practice has been deemed appropriate when the breaching party acted with "[t]he state of mind which accompanies an intentional tort." id. (Supp.) at 179. In this case, the jury __ found against the Ellenwoods on their intentional tort claims. Plaintiffs, however, maintain that this finding should not foreclose punitive damages because they claim that the standard for punitive damages under maritime law is less demanding than the standard for intentional infliction of emotional distress. See Restatement (Second) of Torts 46; Muratore v. M/S Scotia ___ _____________________________ ________ __________ Prince, 845 F.2d 347, 354 (1st Cir. 1988) (maritime standard). ______ And so, plaintiffs contend that the rejection of their intentional tort claims is not fatal to an award of punitive damages. Assuming that maritime law would permit a limited role for punitive damages in the contract setting -- an issue we do not reach -- we think it inconceivable that such damages would be available when the jury specifically has rejected plaintiffs' -34- accompanying intentional tort claims. Thus, even if punitive damages may be awarded under maritime tort law based on conduct ____ that would not satisfy the standard for intentional infliction of emotional distress, we decline to hold that they may be awarded for breach of contract in these circumstances. ________ Whether punitive damages may be available should Ellenwood prevail upon remand on the handicap discrimination claims is an issue not before us today. At the moment this is solely a contract case, and we adhere to the settled rule of law prohibiting such an award. V. Burden of Proof _______________ Exxon attempted to prove at trial that, even if Ellenwood had not been removed from his chief engineer's post in April 1989, he would have lost his job later in the year when Exxon downsized its fleet. Consequently, because Exxon continued to pay Ellenwood's full salary and benefits through January 1991, the company argued that Ellenwood was not entitled to any damages for breach of contract or promise. On appeal, Exxon claims that the district court incorrectly instructed the jury that the company bore the burden of proving that Ellenwood would have been terminated for bona fide reasons ____ ____ unrelated to the new alcohol rehabilitation policy. The burden should have been placed on the plaintiff, Exxon asserts, and this error entitles the company, at a minimum, to a new trial on the contract and estoppel claims. -35- We find it unnecessary to consider this issue on the merits because we conclude that Exxon failed to preserve it. At two separate times, once before the jury charge and once after it, the court and counsel discussed the instruction on this defense. On the first occasion, during the precharge conference, the court announced its decision to impose the burden on the defendant to prove that Ellenwood would have lost his job for independent reasons, and twice repeated its intention to give such an instruction. See Tr. Vol. XI, at 24, 28, 29. ___ At that time, Exxon responded by asking the court to include, within the "independent reasons" portion of the jury charge, a sentence about "business judgment." This addition would have emphasized to the jury that, in considering whether Ellenwood would have been terminated as a result of the fleet's downsizing, it was not permitted to second-guess Exxon's business judgment in devising and applying its ranking system. See Tr. ___ Vol. XI, at 26. The ensuing discussion focused on how to communicate to the jury that its task was limited to determining whether the ranking system was a pretext. The instruction ultimately adopted by the court included language suggested by Exxon's counsel. Id. at 29. At no time during this discussion __ did counsel object to the court's imposing the burden on Exxon. Subsequently, the district court instructed the jury that "Exxon Shipping has the burden of proof to show you that Mr. Ellenwood would have lost his job for independent, nonpretextual reasons," see Tr. Vol. XI, at 51. Following the full charge on ___ -36- all claims, the district court held a sidebar conference in which it heard and responded to both sides' objections. At that time, Exxon's counsel requested an "additional instruction" on damages for breach of contract or promise. The proposed addition consumes 43 lines in the trial transcript. See Tr. Vol. XI, at 64-66.25 The first four ___ paragraphs contained essentially the instruction on business judgment that Exxon had requested earlier. See Tr. Vol. XI, at ___ 65 ("You may not consider whether in your opinion the evaluations or the rankings are appropriate or were done in a manner you agree with.). The next section opens with the assertion that "[t]he sole question you are to consider is whether Exxon Shipping maintained its employee ranking list in good faith," id., and then states that, in deciding the question, "plaintiffs __ have the burden of proof." Id. The proposal goes on to __ elaborate on the plaintiff's burden, i.e., to show "by a preponderance of the evidence that Exxon Shipping manipulated or otherwise misused its ranking procedure in bad faith to cause Mr. Ellenwood to be ranked lower on the ranking list of chief engineers than he otherwise would have been." Id. at 65-66. __ The district court gave the following response to Exxon's proposal: So far as the requested lengthy instruction . . . by the defendant involving rank, proximate cause, good faith, management practices and so on, I am satisfied that would involve me in too great a commentary on the ____________________ 25 The requested instruction is reproduced in its entirety in an appendix to this opinion. -37- evidence. Instead, I've given a general charge concerning the issue of whether Exxon would otherwise have terminated him, required only that its reasons be independent and not pretextual. I believe that that adequately meets the standards in this area. Tr. Vol. XI, at 72. It appears that the district court focused primarily, if not exclusively, on the first portion of Exxon's lengthy request and concluded that its own pretext instruction adequately met Exxon's concern that the jury not consider how good the ranking system was but only whether it was used in good faith. Exxon made no further response and did not inform the court that it also was concerned about who had the burden on this issue. What Exxon did here was not enough to entitle it to assert this issue on appeal as a basis for a new trial. Counsel did not object to the court's burden instruction, but proposed only an addition. The proposal was long and, in its latter portion, contradicted the court's earlier instruction on burden. When the court reacted with comments apparently directed only to the first part of the proposal, counsel made no effort to highlight its concern regarding the burden. This omission is particularly significant in light of the earlier discussion, which focused solely on the business judgment rule. Similarly, in its post-trial memorandum seeking a new trial on the contract and estoppel claims, under the heading "Employee Rankings," Exxon argued only that the court erred "in declining to instruct the jury that it could not second guess the business judgment of Exxon Shipping with respect to its performance -38- evaluations and employee ranking system." See Memorandum, at 9. ___ Again, no reference was made to the burden of proof. Not until its reply brief on appeal did Exxon articulate clearly and concisely its burden of proof objection. It is well established, the company now contends, that the burden of proving bad faith must be on the party seeking to show it because "[d]isproving bad faith is almost always close to impossible." Reply Brief, at 17. Because the issue here was not the quality of Exxon's ranking system, but whether the system was maintained in good faith, the company claims the burden should have been on Ellenwood to prove that Exxon manipulated its rankings in bad faith. We do not reach this argument because it is too late. To consider disassembling the court and jury's substantial work without clearer notice than Exxon gave to the district court would be to snub the requirement in Fed. R. Civ. P. 51 that a party must "stat[e] distinctly the matter objected to and the grounds of objection." Accordingly, we leave undisturbed the district court's judgment on the contract and estoppel claims. VI. Benefits Offset _______________ Exxon has claimed error in the district court's instruction to the jury not to offset the damages award by the amount of special retirement benefits the company has paid or will pay to Ellenwood. Under a "special sea service plan," Exxon contributed to an annuity that distributed monthly payments to retired -39- employees in amounts based on life expectancy. Ellenwood began receiving annuity payments of nearly $20,000 a year following his retirement in 1991 at age 45. It is these payments that Exxon seeks to have offset. Exxon's argument is based on the general principle that an award of lost earnings makes the wrongfully discharged employee whole and that to add pension benefits would give the employee a windfall. Ellenwood counters with his own windfall argument: subtracting the expected benefits from the damages award treats the employer who breaches an employment contract more charitably than one who has observed one faithfully. Both parties cite caselaw to support their claims. In fact, however, we conclude that the record made in this case, rather than general principles, dictates the result. The relevant facts are contained in a letter from an Exxon official in response to a request from Ellenwood's counsel to provide "[t]he 1990 percentages of payroll for the various benefits provided to employees." Brief of Plaintiffs-Appellees at Addendum 18. The letter, which is not mentioned in Exxon's brief, itemized the percentages of payroll attributable to life insurance, medical and dental insurance, Medicare, a thrift plan, long term disability insurance, workers' compensation, and "all other." These items totalled 20.8% But included in the listing, indeed heading the list, was "Annuity" and its percentage, "(2.7%)". In other words, this percentage was deducted from the -40- total of the above listed items, making the bottom line total percentage for fringe benefits 18.1%. The effect of this listing was to indicate to Ellenwood's economic expert on damages that he should add to his computation of lost earnings 18.1% of those earnings to reflect compensation in the form of fringe benefits. Exxon did not add into the benefits total the 2.7% annuity item, which would amount to an annual payment of approximately $2,300. Indeed, the letter subtracted the 2.7% from the remaining total of benefits, thereby reducing by a substantial amount the present discounted value of Ellenwood's fringe benefits. Had there been no breach of the employment contract, the $2,300 yearly contribution apparently would have bought an annuity that, upon Ellenwood's retirement at age 65, would have yielded annual payments in an amount much larger than the present $20,000 amount. We look upon this amount as having been bought by prior Exxon contributions and earned by Ellenwood as part of Exxon's compensation package. To allow Exxon a further deduction for the income stream purchased by the annual $2,300 payment would seem to be, as Ellenwood argues, to allow a double credit. This, at least, is how we read the testimony of plaintiff's economist, Dr. McCausland, who had asked for the percentages applicable to fringe benefits. He testified that the fringe benefit [sic] had to be put into present value terms . . . , it's how many dollars do we have to give him today so he'll have that amount of money available to him in each year to pay for the same fringe benefits. -41- And I based it on their fringe benefit package . . . . And what I did, I took 18.1 percent of the present value of lost earnings, and that works out to be $294,528.79. Tr. Vol. V, at 111. On cross examination Exxon's counsel asked, "Now you were also aware that Mr. Ellenwood is receiving almost $20,000 a year in pension benefits currently from Exxon Shipping Company?" To this, Ellenwood's counsel objected, saying, "that's his money, and it is not properly considered to be mitigation." Whereupon Exxon's counsel withdrew the question. Id. at 121-122. __ On this record the district court ruled that it was "the burden of proof of the defendant to come forward and show that these are benefits being received that should be subtracted from the amounts that plaintiff would otherwise . . . receive" and that "the state of the record doesn't permit that determination." Tr. Vol. XI, at 35. We agree. Indeed, it seems to us that the record is not merely insufficient to support a basis for offset, but points affirmatively to an already accomplished deduction. VII. Conclusion __________ The following is a brief summary of our major holdings: (1) we reverse the district court's ruling that state statutes prohibiting discrimination against the handicapped are preempted by the Rehabilitation Act of 1973 and maritime law, as well as its ruling that plaintiff's claim of violation of state public policy is similarly preempted, and the case therefore is remanded for further proceedings on such claims; -42- (2) we affirm the district court's ruling that Ellenwood's state contract and promissory estoppel claims are not preempted by either the Rehabilitation Act or maritime law; (3) we decline to address the Ellenwoods' claim that the district court improperly granted Exxon's request for judgment as a matter of law on their claims for negligent infliction of emotional distress, concluding that these claims were not adequately developed; (4) we affirm the district court's refusal to submit the issue of punitive damages to the jury; (5) we find that Exxon failed to preserve its challenge to the district court's instruction imposing upon it the burden of demonstrating that Ellenwood would have been removed from his chief engineer's position in late 1989 for bona fide reasons ____ ____ independent of his participation in an alcohol rehabilitation program; (6) and we affirm the district court's decision to exclude from the jury's damages calculation Ellenwood's sea service retirement benefits.26 The judgment of the district court is therefore affirmed in ____________________________________________________________ part, reversed in part, and remanded for further proceedings _________________________________________________________________ consistent with this opinion. No costs. ____________________________ ________ ____________________ 26 We have reviewed the district court's rulings on Ellenwood's privacy claims, and find no error. -43- APPENDIX The following is the full text of Exxon's proposed additional instruction on damages for breach of contract or promise, as discussed supra at page 36. _____ As you know, Mr. Ellenwood ceased receiving a salary from Exxon Shipping on January 15, 1991. If you find as Exxon Shipping claims that Mr. Ellenwood would have been terminated prior to that time in the fall of 1989 because of his low performance ranking compared to other chief engineers when Exxon Shipping's oceangoing fleet was downsized, then no damages should be awarded even if you find that Exxon Shipping breached a contract with Mr. Ellenwood. Under such circumstances, the conduct of Exxon Shipping complained of here was not the proximate cause of any loss Mr. Ellenwood suffered. If on the other hand you find that Mr. Ellenwood would not have been terminated when the fleet was downsized, you may continue to consider damages. During this case a number of witnesses have testified regarding Exxon Shipping's performance evaluation and ranking system. This case is not about whether you agree with or like Exxon Shipping's performance evaluation or ranking procedures, or whether you agree with or like Exxon Shipping's employment practices. As I previously instructed you, you may not substitute your judgment for the company's. I therefore instruct you that your views concerning whether Exxon Shipping's ranking system was well administered cannot be considered by you in rendering your decision in this case. You may not consider whether in your opinion the evaluations or the rankings are appropriate or were done in a manner you agree with. The sole question you are to consider is whether Exxon Shipping maintained its employee ranking list in good faith. In deciding the question, plaintiffs have the burden of proof. By that I mean you must decide whether the plaintiffs have proven by a preponderance of the evidence that Exxon Shipping manipulated or -44- otherwise misused its ranking procedure in bad faith to cause Mr. Ellenwood to be ranked lower on the ranking list of chief engineers than he otherwise would have been. In essence, did Exxon Shipping make its evaluations of Mr. Ellenwood in bad faith with an intent to injure him in order to improve Exxon Shipping's defense in this case. If you conclude that plaintiffs have not proven by a preponderance of the evidence that Exxon Shipping acted in bad faith in establishing its ranking list in 1989, then you must find that Mr. Ellenwood has suffered no damages under either of his contract claims. -45-