[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13012

_____

D.C. Docket No. 1:17-cv-24167-PCH


ANDRE OW BULAND,

Plaintiff-Appellant-Cross Appellee,

versus

NCL (BAHAMAS) LTD,

Defendant-Appellee-Cross Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(March 29, 2021)

Before WILLIAM PRYOR, Chief Judge, JILL PRYOR and ED CARNES, Circuit
Judges.

WILLIAM PRYOR, Chief Judge:

These cross-appeals involve a jury trial about negligent medical treatment of

a passenger aboard a cruise ship. The jury awarded the injured passenger more

than $2,000,000 in damages, which the district court remitted to an award of just over $1,700,000. But the passenger argues that the district court erred by excluding testimony about damages for loss of earning capacity from his expert economist and by granting a directed verdict for the cruise line on that issue. And the cruise line argues that the district court erred by refusing to give its requested jury instruction about medical negligence at sea and by denying its motion for a new trial. We reject the arguments for both the passenger and the cruise line and affirm.

## I. BACKGROUND

Andre Ow Buland is a citizen of Trinidad and Tobago. For over 12 years, he worked as the chief financial officer of several large corporations in Trinidad. He made around $135,000 a year in his last five years in that role. But the job was stressful, so Ow Buland resigned to pursue development projects for a few real properties he owned instead.

Before turning to real-estate development, Ow Buland decided that he first needed a vacation. He and his wife departed for a five-day cruise from Miami to Jamaica and back. They boarded the *Norwegian Pearl*, a cruise ship owned and operated by NCL (Bahamas) Ltd., a Bermuda company doing business as Norwegian Cruise Line.

Ow Buland woke up early in the morning of the third day of the cruise with stomach pain. He felt weak and had acid reflux pain all day. After he vomited at dinner, he went to the ship infirmary.

The ship's doctors administered a blood test, a chest x-ray, and an electrocardiogram. The medical tests confirmed Ow Buland was having a heart attack, so the doctors admitted him to the ship's intensive care unit. Based upon a remote consultation with the Cleveland Clinic and not knowing if there were facilities to treat an arterial blockage in the closest port city, the ship's doctors concluded it was safest for Ow Buland to stay on the ship for treatment.

The ship carried thrombolytic medications, which are clot-busting medicines used to treat heart-attack patients. But the ship's doctors decided it was too risky to treat Ow Buland with a thrombolytic. He had been experiencing symptoms for too long already, and he had recently undergone medical procedures that created a risk thrombolytics could cause life-threatening internal bleeding.

The ship's medical staff monitored Ow Buland in the intensive care unit until the ship arrived in Miami a day and a half later. An ambulance waiting at the port took him to the hospital. Ow Buland was admitted to Mount Sinai Hospital in Miami Beach, where he underwent a cardiac catheterization and had four stents implanted. He returned home to Trinidad and eventually got a pacemaker. He continues to suffer from medical problems caused by the damage to his heart.

Ow Buland sued NCL for negligence. He alleged that its medical staff failed to diagnose and properly manage his status and failed to evacuate him from the ship. And he claimed damages including the "loss of [the] capacity to earn money." He invoked both diversity-of-citizenship, 28 U.S.C. § 1332, and admiralty jurisdiction, *id.* § 1333.

Because the parties initially proceeded under the assumption that the district court had diversity jurisdiction, both requested a jury trial. But our intervening decision in *Caron v. NCL (Bahamas), Ltd.* clarified that diversity jurisdiction was unavailable. 910 F.3d 1359, 1365 (11th Cir. 2018) ("[Section] 1332(a)(2) does not grant jurisdiction over a suit between a corporation incorporated solely in a foreign state and another alien . . . ."). Ow Buland's complaint fell only within admiralty jurisdiction, which meant the parties did not have a right to a jury trial. Fed R. Civ. P. 9(h)(1), 38(e). But the district court granted Ow Buland's unopposed motion to try the case to a jury by the parties' consent. *Id.* R. 39(c)(2).

Ow Buland retained Gary A. Anderson, Ph.D., as a damages expert. Dr. Anderson is an economist, and Ow Buland offered him to testify about the value of Ow Buland's lost earning capacity. Dr. Anderson prepared three models to estimate Ow Buland's lost-earning-capacity damages. Each model assumed Ow Buland's pre-injury earning capacity was equal to his salary when he resigned as a chief financial officer. The models varied in their assumptions about Ow Buland's

4

post-injury earning capacity. One model assumed Ow Buland could obtain a part-time teaching job that would pay $14,570 a year. Another assumed he could sit on corporate boards and earn $14,990 a year. A third model, based on Ow Buland's pursuit of real estate development opportunities, was later withdrawn as unrealistic. Dr. Anderson selected the potential career options for the models based on a discussion with Ow Buland.

NCL moved for partial summary judgment on the availability of damages for loss of earning capacity. It argued that Ow Buland had no competent evidence to establish the magnitude of any diminished capacity because Dr. Anderson was not a vocational expert and his analysis was based only on Ow Buland's subjective opinions about the work he could perform after his heart attack, not his actual post-injury earning capacity. NCL withdrew that motion, but later moved *in limine* to exclude Dr. Anderson's testimony on loss of earning capacity. It argued that the assumptions underlying Dr. Anderson's models were unsupported and that his testimony was unreliable. The district court granted the motion to exclude.

The parties proceeded to a five-day jury trial. At the close of evidence, NCL moved for a directed verdict on the issue of lost earning capacity. The district court agreed that Ow Buland failed to prove the extent of any impairment of his earning capacity with enough certainty for a jury to determine a reasonable award of damages. It granted NCL's motion for a directed verdict.

The district court instructed the jury using a pattern instruction for medical negligence. It refused NCL's request to modify the pattern instruction to add emphasis that doctors at sea are not held to the same standard of care as doctors on land. The jury found NCL negligent and awarded $1.2 million in non-economic damages, $800,000 in future medical expenses, and $84,000 in lost services. Ow Buland later accepted remittitur, and the award was reduced to $1,712,862.

NCL moved for a new trial. It based its motion on the failure of the district court to give the jury a maritime-specific instruction about medical negligence and on Ow Buland's experts' failure to acknowledge the differences between cruise-line medicine and land-based medicine. The district court denied the motion.

## II. STANDARDS OF REVIEW

"We review a district judge's exclusion of expert testimony only for abuse of discretion" and defer to that decision "unless it is manifestly erroneous." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1305 (11th Cir. 2014) (internal quotation marks omitted). We review a directed verdict *de novo*. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1114 (11th Cir. 2005). We "examine the evidence in a light most favorable to the non-moving party" and affirm if "there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party on that issue." *Id.* (internal quotation marks omitted). And we review the denial of a motion for a new trial for

abuse of discretion. *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002). When a party moves for a new trial based on the sufficiency of the evidence but does not move for a directed verdict on that basis, our review is limited to "inquir[ing] into whether *any* evidence supported submission of the issue" to the jury. *Coker v. Amoco Oil Co.*, 709 F.2d 1433, 1437 (11th Cir. 1983).

## III. DISCUSSION

We divide our discussion in three parts. First, we explain the basis for admiralty jurisdiction over complaints of medical negligence brought by passengers of cruise ships. Second, we address the exclusion of testimony from Ow Buland's damages expert and the directed verdict for NCL on lost-earning-capacity damages. And third, we address NCL's motion for a new trial.

### A.  Cruise-Line Medical Negligence Claims Are Cognizable in Admiralty Jurisdiction.

The parties agree that the district court had admiralty jurisdiction. But we are obligated to review our subject-matter jurisdiction *sua sponte*. *Nance v. Comm'r, Ga. Dep't of Corr.*, 981 F.3d 1201, 1204 (11th Cir. 2020). Because we have never explained the basis for admiralty jurisdiction over a complaint of medical negligence brought by a cruise-ship passenger, we do so here before turning to the merits of the appeal.

The judicial power of the United States extends "to all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III § 2, cl. 1. By statute, Congress gave

7

the district courts original jurisdiction of "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333. Traditionally, the determination of whether a tort fell within the admiralty jurisdiction of the federal courts turned on whether the wrong occurred on navigable waters. *See Exec. Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 253 (1972) (explaining the traditional rule of locality). But the Supreme Court later clarified that a tort must also have "a significant connection with traditional maritime activity" to fall within maritime jurisdiction. *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 674 (1982).

A tort falls within admiralty jurisdiction when two conditions are satisfied. First, "the incident occurred on navigable water, or the injury was caused by a vessel on navigable water." *Caron*, 910 F.3d at 1365. And second, "the incident is connected with maritime activity." *Id.* The second condition requires courts to "assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce," and to "determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995) (internal quotation marks and citations omitted).

Both conditions are satisfied in this appeal. First, the medical negligence occurred on the navigable waters between Jamaica and Miami. Second, the

8

medical negligence is connected to the traditional maritime activity of providing care and comfort to ship passengers. Medical negligence aboard a cruise ship has "a potentially disruptive impact on maritime commerce," *id.* (internal quotation marks omitted), because, among other reasons, failure to provide reasonable medical care under the circumstances may force a cruise ship to make an unplanned stop and disrupt the cruise for other passengers. And "the general character of the activity giving rise to the incident"—here, caring for sick passengers—"shows a substantial relationship to traditional maritime activity." *Id.* (internal quotation marks omitted).

It has long been the case that "[a] contract for passage by water implies something more than ship room and transportation. It includes reasonable comforts, necessaries, and kindness, and suitable food and the common means of relief in cases of sickness." *Defrier v. The Nicaragua*, 81 F. 745, 745 (S.D. Ala. 1897) (citing *Chamberlain v. Chandler*, 5 F. Cas. 413, 414 (C.C.D. Mass. 1823) (No. 2,575) (Story, J.)). The Passenger Act of 1882 also imposed a duty to provide medical care for passengers:

> [E]very steamship or other vessel carrying or bringing emigrant passengers, or passengers other than cabin passengers, exceeding fifty in number, shall carry a duly qualified and competent surgeon or medical practitioner . . . who shall be provided with surgical instruments, medical comforts, and medicines proper and necessary for diseases and accidents incident to sea-voyages, and for the proper medical treatment of such passengers during the voyage . . . .

Pub. L. No. 47-374, § 5, 22 Stat. 186, 188. To be sure, today's "state-of-the-art cruise ships . . . , complete with well-stocked modern infirmaries and urgent care centers," have come a long way from "nineteenth-century steamships." *Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1239 (11th Cir. 2014). But caring for sick passengers is a "traditional maritime activity," *Jerome B. Grubart, Inc.*, 513 U.S. at 534 (internal quotation marks omitted), even if performed in a more sophisticated way today. The district court had admiralty jurisdiction over Ow Buland's complaint about a maritime tort.

### B. The District Court Did Not Err by Excluding Testimony from Ow Buland's Expert Economist and Granting a Directed Verdict on Loss of Earning Capacity.

"An award for impaired earning capacity is intended to compensate the worker for the diminution in [his] stream of income." *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 533 (1983). The *en banc* former Fifth Circuit explained that calculating such an award "involves four steps: estimating the loss of work life resulting from the injury or death, calculating the lost income stream, computing the total damage, and discounting that amount to its present value." *Culver v. Slater Boat Co.*, 722 F.2d 114, 117 (5th Cir. 1983) (en banc). "The base figure" arrived at before discounting to present value "is the difference between what a person could have earned 'but for' the accident and what he is able to earn upon returning to work in his partially disabled state." *Masinter v. Tenneco Oil*

10

*Co.*, 867 F.2d 892, 899 (5th Cir. 1989), *mandate recalled and modified*, 934 F.2d 67 (5th Cir. 1991).

Ow Buland challenges two orders related to his request for damages for loss of earning capacity. We first discuss the exclusion of testimony about loss of earning capacity from Ow Buland's economic expert. We then discuss the directed verdict on lost-earning-capacity damages.

1.  Dr. Anderson's Testimony Was Unreliable Because It Was Based on Unsupported Assumptions About Ow Buland's Post-Injury Earning Capacity.

The district court did not abuse its discretion by excluding Dr. Anderson's testimony on the value of Ow Buland's lost earning capacity. Federal Rule of Evidence 702 establishes the prerequisites for expert testimony to be admissible into evidence:

> (1) [T]he expert [must be] qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions [must be] sufficiently reliable as determined by the sort of inquiry mandated in *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)]; and (3) the testimony [must] assist[] the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (footnote omitted). "The *Daubert* requirement that the expert testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis—means that any step that renders the analysis unreliable under the

11

[*Daubert*] factors renders the expert's testimony inadmissible." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1341 (11th Cir. 2010) (alteration rejected) (internal quotation marks omitted).

Dr. Anderson used the following steps to estimate the present value of Ow Buland's lost earning capacity. First, he used Ow Buland's actual history of earnings as his pre-injury earning capacity. From there, he assumed modest yearly salary increases over the course of Ow Buland's working life, added the value of fringe benefits, and adjusted for mortality and taxes. Then, he subtracted the amount Ow Buland would be expected to earn in each of several post-injury careers. Finally, he discounted the difference to present value and reported the resulting number as Ow Buland's loss of earning capacity. Based on that methodology, Dr. Anderson's testimony was reliable only to the extent the hypothetical careers it was based on approximated Ow Buland's actual post-injury earning capacity.

Dr. Anderson's assumption that Ow Buland did not have career opportunities more lucrative than working as a part-time university teacher or member of a corporate board was entirely speculative. Dr. Anderson testified in his deposition that he "identified [the] alternative scenarios for prospective post injury employment pursuant to [a] discussion with Mr. Ow Buland." He "rel[ied] on the testimony of [an expert cardiologist] that . . . [Ow Buland] is not capable of

12

performing the work of a [chief financial officer]." And he also relied on a letter from a recruiting director explaining that "senior finance professionals [in Trinidad and Tobago] typically . . . work extended hours on a consistent basis" and suggesting that Ow Buland "may be more suited to a flexible working arrangement that would allow him to control his working hours in line with his physical limitation."

To be admissible under *Daubert*, an expert's opinion must be "supported by good grounds for each step in the analysis." *Id.* (internal quotation marks omitted). Dr. Anderson did not have good grounds to support his assumption that there was no middle ground between Ow Buland's suggestions about the kinds of part-time work he could perform and the work as a senior finance professional he could no longer perform. The unsupported assumption made his testimony unreliable. The district court did not abuse its discretion by excluding Dr. Anderson's testimony on loss of earning capacity.

2. NCL Was Entitled to a Directed Verdict Because Ow Buland Did Not Prove the Amount of His Lost-Earning-Capacity Damages.

Ow Buland argues that at trial he "presented more than sufficient lay and medical testimony to establish a permanent injury, and a significant diminution in his ability or capacity to earn income." He contends that his pre-injury earning capacity is evident from his previous salary as a chief financial officer, and that his medical experts established that the injury prevented him from returning to a

13

stressful full-time job. And he contends that he testified to his ability to work as a part-time university teacher or member of a corporate board with specificity about what he could earn in those positions.

But there is a significant gap between the 10-hour workweek Ow Buland testified he could handle and the 60-hour workweek his medical experts testified he could no longer handle. "[T]ort law requires an aggrieved plaintiff to prove [his] damages with a reasonable degree of certainty." *Guyana Tel. & Tel. Co. v. Melbourne Int'l Commc'ns, Ltd.*, 329 F.3d 1241, 1248 (11th Cir. 2003); *see also* Restatement (Second) of Torts § 912 (Am. L. Inst. 1979). A jury award for lost earning capacity must be supported by record evidence of the upper limit of the plaintiff's post-injury earning capacity. *See Myers v. Griffin-Alexander Drilling Co.*, 910 F.2d 1252, 1253, 1255 (5th Cir. 1990).

Ow Buland failed to present evidence that "the part-time jobs *he believes* he is qualified and capable of performing, such as sitting on corporate boards, and part-time university level teaching," represent the full extent of his post-injury earning capacity. Without evidence establishing that fact, any jury award for lost earning capacity would have been unduly speculative. Because there was no legally sufficient evidentiary basis for the jury to award Ow Buland damages for loss of earning capacity, the district court correctly granted NCL's motion for a directed verdict. *See* Fed. R. Civ. P. 50(a).

14

*C. NCL Is Not Entitled to a New Trial.*

NCL cross-appeals from the order denying its motion for a new trial. It argues that it is entitled to a new trial because the district court erred by refusing to give the jury a standard-of-care instruction that was tailored to the maritime medical malpractice context, and because Ow Buland's expert witnesses testified to the standard of care in a land-based emergency room, not one at sea. We address NCL's arguments in turn.

1. The District Court Correctly Instructed the Jury.

We have explained that "[i]t is indisputable that cruise lines must treat their passengers with 'ordinary reasonable care under the circumstances.'" *Franza*, 772 F.3d at 1253 (quoting *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989)). And we have explained how that duty, which is the standard for all maritime torts, applies in the context of medical negligence. "Implicit in this variable standard is the notion that cruise lines will not always be held to the same standard of care that would guide treatment onshore. This is as it should be, since standards of care typically vary among differently situated healthcare providers." *Id.*

The district court instructed the jury in accordance with *Franza*. It explained that reasonable care is defined in the light of "*all relevant surrounding circumstances*" and that medical negligence is "doing something that a reasonably

15

careful physician would not do *under like circumstances* or failing to do something that a reasonably careful physician would do *under like circumstances*." A district court "enjoys broad discretion to formulate jury instructions provided those instructions are correct statements of the law." *United States v. Lebowitz*, 676 F.3d 1000, 1014 (11th Cir. 2012). The instruction given correctly stated the law, and the exact wording of it fell within the discretion of the district court.

The district court did not abuse its discretion by choosing a more general formulation of the instruction than the one NCL requested. NCL argues the district court should have instructed the jury that "[r]easonable care on the part of a physician *in an admiralty case involving medical malpractice*" is defined in reference to "similar and reasonably careful physicians *in the same maritime environment*," and that medical negligence is "doing something that a reasonably careful physician *in the same maritime environment* would not do under like circumstances or failing to do something that a reasonably careful physician *in the same maritime environment* would do under like circumstances." That proposed instruction is as accurate as the instruction the district court gave. But it is up to the litigants—not the district court—to present the evidence and to make the case to the jury about which circumstances are relevant to the standard of care in a case of medical negligence.

16

2. Sufficient Evidence Supported the Verdict Against NCL.

NCL also argues that a new trial is necessary because Ow Buland "did not establish the requisite standard of care applicable to a physician facing a cardiac emergency at sea or then prove that NCL's doctors did not meet the applicable standard of care." We understand this to be an argument that the evidence was insufficient to support the jury's verdict. But NCL did not move for a directed verdict based on Ow Buland's failure to prove a violation of the correct standard of care. After the close of evidence, it moved for a directed verdict on four grounds: failure to prove past medical expenses, failure to prove any alleged breach exacerbated the damage caused by the heart attack, failure to prove future medical expenses, and failure to prove lost earning capacity. But it did not argue that Ow Buland failed to prove a breach of the correct standard of care until it moved for a new trial.

"[A]n appellate court cannot examine the sufficiency of the evidence supporting the jury's verdict unless the objecting party filed a timely motion for directed verdict with the trial court." *Coker*, 709 F.2d at 1437. When a party allows an issue to go to the jury without first objecting to the sufficiency of the evidence, our review on appeal is limited to "inquir[ing] into whether *any* evidence supported submission of the issue." *Id.* The issue before us is "whether there was

17

an absolute absence of evidence to support the jury's verdict." *Wilson v. Attaway*, 757 F.2d 1227, 1237 n.3 (11th Cir. 1985) (internal quotation marks omitted).

Some evidence supported the jury's finding that NCL did not exercise reasonable care under the circumstances. The district court observed that "[NCL] had the ability to administer a thrombolytic . . . [and the] decision was made not to . . . . [It] had the ability to go to the nearest port and disembark . . . and [NCL] didn't do that, and that's a circumstance . . . the jury certainly could and probably did consider." And the district court pointed out that NCL offered testimony "that the facilities onboard the ship were at least the equivalent of a land-based emergency room," which the jury could have relied on to find that NCL failed to treat Ow Buland as well as it could have even under the circumstances. Some evidence existed to support the jury's finding that NCL failed to provide reasonable care under the circumstances. So we cannot disturb the verdict based on Ow Buland's alleged failure to prove a breach of the proper standard of care. NCL is not entitled to a new trial.

## IV. CONCLUSION

We **AFFIRM**.

18