[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-12476

_____

RYAN MAUNES MAGLANA,
FRANCIS KARL BUGAYONG,
on their own behalf and as class representatives
 of all other similarly situated Filipino crewmembers
 trapped aboard CELEBRITY cruise vessels,

Plaintiffs-Appellants,

*versus*

CELEBRITY CRUISES INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cv-22133-JEM

_____

Before WILLIAM PRYOR, Chief Judge, and GRANT and LUCK, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether seamen, confined for months on a cruise ship during the coronavirus pandemic, stated claims, under the general maritime law, for false imprisonment and intentional infliction of emotional distress. When the pandemic hit, cruise ships around the globe were stranded. Two seamen, Ryan Maunes Maglana and Francis Karl Bugayong, sued their employer, Celebrity Cruises Inc., for false imprisonment and intentional infliction of emotional distress after Celebrity took two months to repatriate them to the Philippines. The district court dismissed their complaint of intentional torts for failure to state a claim. It ruled that the complaint failed to allege an unlawful detention and that Celebrity's conduct was not "outrageous." We affirm.

## I. BACKGROUND

In early 2020, Ryan Maunes Maglana and Francis Karl Bugayong worked as seamen on the *Millennium*, a cruise ship owned by Celebrity Cruises Inc. Both seamen—two of the thousands of Filipinos who serviced Celebrity's vessels—were long-

term employees. Maglana, who had sailed with the Florida-based cruise line for 14 years, worked as a beverage controller. And Bugayong, with four years of experience, stocked the ship's bars.

The coronavirus pandemic interrupted the *Millennium*'s winter itinerary. Anxious to deboard its passengers, the *Millennium* first attempted to dock in Hong Kong and then in Thailand. But those ports, wary of the spreading virus, turned the ship away. Eventually, Singapore agreed to let the ship's passengers disembark on February 10, 2020. The *Millennium* then sailed east with its crew to Manila, arriving at the Philippine capital in late February. Maglana and Bugayong, eager to weather the pandemic in their home country, hoped to leave the ship. But those hopes were dashed when they departed from the Philippines on the *Millennium* a day later. Both men still had time on their contracts, and Celebrity allowed only the crewmembers who had completed their terms of service to disembark.

From there, the *Millennium* journeyed across the Pacific. After a brief stop in Honolulu on March 1, the ship sailed to Ensenada, Mexico. While the ship docked in Mexico, Celebrity's parent company, Royal Caribbean, suspended all future cruises on March 13. The next day, the Centers for Disease Control and Prevention issued its first No Sail Order, suspending cruise ship operations from United States ports. *See* No Sail Order and Suspension of Further Embarkation, 85 Fed. Reg. 16628, 16628 (Mar. 24, 2020). At that point, Celebrity permitted some employees to disembark but denied Maglana and Bugayong—along with many other Filipino

workers—permission to do the same. So when the *Millennium* set sail to San Diego, California, on March 19, its Filipino crewmen went with it.

Starting on March 20, the *Millennium* and its crew anchored in San Diego Bay. Ten days into their stay, Maglana took a bottle of expensive scotch from one of the ship's bars and shared it with Bugayong. Celebrity fired them for taking the bottle—which it charged as theft but Maglana protests was not—on March 30. Under the terms of their employment agreement, Celebrity ordinarily would have repatriated the two men to the Philippines. But because of the No Sail Order, Maglana and Bugayong remained stuck on the ship with the rest of the crew.

On April 23, the Centers for Disease Control announced that cruise lines could release their crewmembers to return to their home countries. But before the *Millennium*'s crew could leave the ship, Celebrity had to certify that the cruise line would comply with the Centers for Disease Control's detailed repatriation protocol. That protocol prohibited the crewmembers from interacting with the public on their way home—so no commercial flights, no hotel stays, no public transportation, no public airport terminals, and no layovers exceeding eight hours. Celebrity waited ten days before it certified its compliance with the protocol on May 3.

After 18 more days passed without the repatriation of the *Millennium*'s Filipino crew, Maglana sued Celebrity "on behalf of all . . . Filipino crewmembers trapped onboard CELEBRITY cruise vessels" on May 21. His complaint sought emergency injunctive

relief and damages. Then, on May 26, a few days after Maglana filed his complaint, Celebrity repatriated Maglana, Bugayong, and 200 other Filipino crewmembers to the Philippines via charter flight. These crewmembers flew home with little to show for the months that they docked in San Diego. Aside from two "goodwill payment[s]" of $400 each, Celebrity did not pay any crewmembers' wages for their time in the United States' waters.

Maglana filed an amended complaint in June. [This version added Bugayong as a named plaintiff and asserted claims for intentional infliction of emotional distress, false imprisonment, employment discrimination, and wages and penalties pursuant to 46 U.S.C. § 10313. Celebrity moved to dismiss the complaint, and it asked the district court to compel arbitration, which it argued was required by the crewmen's employment agreements.

The district court dismissed the complaint and ordered the parties to arbitrate. Maglana and Bugayong appealed the order only to the extent that it compelled arbitration of their intentional-tort claims. We agreed that the "intentional torts . . . [were] outside the scope of [the] arbitration agreement[]" and reversed. *Maglana v. Celebrity Cruises, Inc.*, No. 20-14206, 2022 WL 3134373, at *1 (11th Cir. Aug. 5, 2022).

On remand, Celebrity moved to dismiss for failure to state a claim. For the claim of false imprisonment, Celebrity argued that its actions "[were] not unlawful," "[were] not 'without legal authority,'" and "[were] not unreasonable and unwarranted under the circumstances." For the claim of intentional infliction of

emotional distress, Celebrity responded that its behavior was not outrageous.

The district court agreed with Celebrity and dismissed Maglana and Bugayong's intentional-tort claims. It reasoned that although Maglana and Bugayong alleged that their confinement "during the beginning of the COVID-19 crisis was 'clearly in violation of US and international law,'" they made "no mention" of what laws Celebrity violated. Indeed, their complaint, which cited the No Sail Order, "provide[d] grounds for the holding of crew members aboard the *Millennium*." Because the allegations "fail[ed] to mention which law [Celebrity] violated," the district court found that the complaint failed to state a claim for false imprisonment. As for intentional infliction of emotional distress, it ruled that "[t]he delay in disembarking Filipino crew members may be seen as negligent or frowned upon, but . . . [it] does not 'exceed all possible bounds of decency.'"

## II. STANDARD OF REVIEW

We review *de novo* a dismissal for failure to state a claim. *Jara v. Núñez*, 878 F.3d 1268, 1271 (11th Cir. 2018). We "accept as true the facts" alleged in the complaint and "draw all reasonable inferences" in Maglana and Bugayong's favor. *Id.* at 1271–72 (citation and internal quotation marks omitted). Still, these facts must present "sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). And we need not

credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.*

## III. DISCUSSION

Maritime law is federal law. The Constitution "extend[s]" the "judicial Power" "to all Cases of admiralty and maritime Jurisdiction." U.S. CONST. art. III, § 2. With this grant of jurisdiction, the Constitution placed the "entire subject" of maritime law, "including its substantive" and "procedural features, under national control." *Detroit Tr. Co. v. The Thomas Barlum*, 293 U.S. 21, 43 (1934). At the Founding, "existing maritime law became the law of the United States," *id.*, and "displace[d] the local law of individual states," Caleb Nelson, *The Persistence of General Law*, 106 COLUM. L. REV. 503, 514 (2006). Congress, through its power to make all laws "necessary and proper for carrying into execution the . . . powers vested by th[e] Constitution in the government of the United States," retains "paramount power to fix and determine the maritime law which shall prevail throughout the country." *S. Pac. Co. v. Jensen*, 244 U.S. 205, 214–15 (1917) (internal quotation marks omitted).

The federal judiciary, "in the absence of federal statutory authority," "fashion[s] the general maritime law" to "fill[] [in] the legislative interstices." BRYAN A. GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT § 69, at 567–68 (2016); *accord United States v. Reliable Transfer Co.*, 421 U.S. 397, 409 (1975) ("Congress has largely left to [the Supreme] Court the responsibility for fashioning the controlling rules of admiralty law." (citation and internal quotation marks omitted)); *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 405 n.17

(1970) (stating that courts are not barred from announcing maritime rules simply because Congress has "not legislat[ed] on [the] subject"). When we decide a maritime tort case, like this one, we act as a "federal common law court." *Air & Liquid Sys. Corp. v. DeVries*, 139 S. Ct. 986, 992 (2019) (citation and internal quotation marks omitted). "[A]s under the common law of torts," a person may be liable "[u]nder the general maritime law . . . for certain intentional wrongs, such as conversion, assault and battery, [and] false imprisonment." *See* 1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 5:3 (6th ed. 2024).

A maritime tort falls within our admiralty jurisdiction when "two conditions are satisfied." *Buland v. NCL (Bahamas) Ltd.*, 992 F.3d 1143, 1149 (11th Cir. 2021). First, the incident or injury must "occur[] on navigable water." *Id.* (citation and internal quotation marks omitted). Second, it must have "a potentially disruptive impact on maritime commerce" and "a substantial relationship to traditional maritime activity." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995) (citation and internal quotation marks omitted).

Neither party disputes that those conditions are satisfied here. Both alleged torts—false imprisonment and intentional infliction of emotional distress—occurred on navigable waters. And these intentional torts are connected to the traditional maritime activity of employing seamen on ships. The intentional infliction of emotional distress on and false imprisonment of seamen by their employers, particularly in relation to a quarantine or

pandemic, has "a potentially disruptive impact on maritime commerce" because it could halt, delay, or interfere with a ship's timely completion of its voyage or lead to unrest among a ship's crew. *Id.* (citation and internal quotation marks omitted). And the "general character of the activity giving rise to the incident[s]"—the employment relationship between seamen and the owners of their ship—lies at the heart of "traditional maritime activity." *Id.* (citation and internal quotation marks omitted).

We divide our discussion into two parts. First, we explain that Maglana and Bugayong failed to state a claim for false imprisonment because they failed to allege facts that would suggest that their confinement was unlawful. Second, we explain that they failed to state a claim for intentional infliction of emotional distress because Celebrity's conduct was not outrageous.

### A. Maglana and Bugayong Failed to State a Claim for False Imprisonment.

Maglana and Bugayong challenge the dismissal of their claim of false imprisonment. They assert that the lawfulness of their confinement is an affirmative defense, not an element of a claim for false imprisonment. And they argue, in the alternative, that a sentence in their complaint—that Celebrity "violate[d] [its] legal obligations under the laws of this country, International law and the Maritime Labor Convention of 2006 and its amendments"—sufficiently alleged that Celebrity's conduct was unlawful.

We disagree. The lawfulness of the confinement is an element of the tort, and Maglana and Bugayong's vague reference to various laws failed to satisfy their pleading burden.

No statute or controlling precedent states the elements for the intentional tort of false imprisonment under maritime law, so we possess "broad discretion" to "develop th[e] law." *Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1232 (11th Cir. 2014). "Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." *E. River S.S. Corp. v Transamerica Delaval Inc.*, 476 U.S. 858, 864–65 (1986). On top of these sources, we examine "legislation, treatises, . . . scholarly writings," *Air & Liquid Sys. Corp.*, 139 S. Ct. at 992, and "Restatements to help identify the governing principles," Nelson, *supra*, at 517; *see also* SCHOENBAUM, *supra*, § 4:1 ("When new situations arise that are not directly governed by legislation or admiralty precedent, federal courts may fashion a rule for decision by a variety of methods . . . , look[ing] to state statutory law and to precepts of the common law."). The success of the claim of false imprisonment turns on whether the general maritime law incorporates "unlawfulness" as an element.

We canvas state law first. Almost every state treats the unlawfulness of confinement as an element of a claim of false imprisonment. The plaintiff must make an initial showing that the defendant lacked lawful authority to restrain him. Florida, for example, requires a plaintiff suing for false imprisonment to establish, among other things, an "unlawful detention and deprivation of

23-12476                Opinion of the Court                    11

liberty" that is "without legal authority or color of authority." *City of Boca Raton v. Basso*, 242 So. 3d 1141, 1143 (Fla. Dist. Ct. App. 2018) (citation and internal quotation marks omitted). Kentucky, for its part, describes false imprisonment as "any deprivation of the liberty of one person by another" that is "wrongful, improper, or without a claim of reasonable justification, authority or privilege." *Banks v. Fritsch*, 39 S.W.3d 474, 479 (Ky. Ct. App. 2001). "To sustain a recovery for the tort of false imprisonment" in Kentucky, "[the] complainant must establish that he was detained and that the detention was unlawful." *Wal-Mart Stores, Inc. v. Mitchell*, 877 S.W.2d 616, 617 (Ky. Ct. App. 1994). Indeed, even states like Arizona and Delaware with the shortest formulations of the tort of false imprisonment include the element of "unlawfulness" or "lack of authority." *See Cullison v. City of Peoria*, 584 P.2d 1156, 1160 (Ariz. 1978) (defining false imprisonment as "the detention of a person without his consent and without lawful authority"); *Slade v. City of Phoenix*, 541 P.2d 550, 552 (Ariz. 1975) ("The essential element necessary to constitute either false arrest or false imprisonment is unlawful detention."); *Hunt ex rel. DeSombre v. State*, 69 A.3d 360, 368 (Del. 2013) (defining false imprisonment as "(a) a restraint which is both (b) unlawful and (c) against one's will" (alteration adopted) (citation and internal quotation marks omitted)).

Thirty-nine other states and the District of Columbia follow suit. Although these states' formulas vary, a common theme unites them all: not only must the restraint confine a person against his will, but the confiner must also lack the lawful authority to do so. *See Mouktabis v. Clackamas County*, 536 P.3d 1037, 1047 (Or. Ct. App.

2023); *Gallagher v. S. Shore Hosp., Inc.*, 197 N.E.3d 885, 909 (Mass. App. Ct. 2022); *Dill v. Kroger Ltd. P'ship I*, 860 S.E.2d 372, 380–81 (Va. 2021); *Heining v. Abernathy*, 295 So. 3d 1032, 1036–37 (Ala. 2019); *Davis v. State*, 902 N.W.2d 165, 186–87 (Neb. 2017); *Trammell v. Wright*, 489 S.W.3d 636, 638 (Ark. 2016); *Ali v. All. Home Health Care, LLC*, 53 N.E.3d 420, 432 (Ind. Ct. App. 2016); *Wilkerson v. Duke Univ.*, 748 S.E.2d 154, 158 (N.C. Ct. App. 2013); *Ojo v. Lorenzo*, 64 A.3d 974, 982 (N.H. 2013); *Enders v. District of Columbia*, 4 A.3d 457, 461 (D.C. 2010); *Leang v. Jersey City Bd. of Educ.*, 969 A.2d 1097, 1117 (N.J. 2009); *Ferrell v. Mikula*, 672 S.E.2d 7, 10 (Ga. Ct. App. 2008); *Santillo v. N.M. Dep't of Pub. Safety*, 173 P.3d 6, 10 (N.M. Ct. App. 2007); *Kennedy v. Sheriff of E. Baton Rouge*, 935 So. 2d 669, 690 (La. 2006); *Law v. S.C. Dep't of Corr.*, 629 S.E.2d 642, 651 (S.C. 2006); *Highfill v. Hale*, 186 S.W.3d 277, 280 (Mo. 2006); *Lee v. Langley*, 121 P.3d 33, 38 (Utah Ct. App. 2005); *Walters v. J.C. Penney Co.*, 82 P.3d 578, 583 (Okla. 2003); *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002); *Rife v. D.T. Corner, Inc.*, 641 N.W.2d 761, 767 (Iowa 2002); *Hughes v. Pullman*, 36 P.3d 339, 343 (Mont. 2001); *Hart v. Miller*, 609 N.W.2d 138, 148 (S.D. 2000); *Arthur v. Lutheran Gen. Hosp., Inc.*, 692 N.E.2d 1238, 1243 (Ill. App. Ct. 1998); *Brown v. State*, 927 P.2d 938, 940 (Kan. 1996); *Montgomery Ward v. Wilson*, 664 A.2d 916, 925–26 (Md. 1995); *Stern v. Thompson & Coates, Ltd.*, 517 N.W.2d 658, 666 (Wis. 1994); *Reed v. City & County of Honolulu*, 873 P.2d 98, 109 (Haw. 1994); *Fermino v. Fedco, Inc.*, 872 P.2d 559, 567 (Cal. 1994); *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994); *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn. 1990); *Willoughby v. Lehrbass*, 388 N.W.2d 688, 702 (Mich. Ct. App. 1986); *Bender v. City of*

*Seattle*, 664 P.2d 492, 499 (Wash. 1983); *Hernandez v. City of Reno*, 634 P.2d 668, 671 (Nev. 1981); *Nadeau v. State*, 395 A.2d 107, 116 (Me. 1978); *Broughton v. State*, 335 N.E.2d 310, 314 (N.Y. 1975); *Mailey v. Est. of De Pasquale*, 177 A.2d 376, 379 (R.I. 1962); *Felix v. Hall-Brooke Sanitarium*, 101 A.2d 500, 502 (Conn. 1953); *Clark v. Alloway*, 170 P.2d 425, 428 (Idaho 1946); *Williamson v. Glen Alum Coal Co.*, 78 S.E. 94, 95 (W. Va. 1913); *cf. Uebelacker v. Cincom Sys., Inc.*, 549 N.E.2d 1210, 1219 (Ohio Ct. App. 1988) ("The tort of false imprisonment arises when one is confined intentionally . . . against his will and without lawful justification. The plaintiff need only demonstrate that he was deprived of his liberty. The presumption then arises that the restraint was unlawful, and . . . the defendant [must] show legal justification." (citations omitted)).

Venerable treatises also state that the confinement must be unlawful. Blackstone explained that, at common law, false imprisonment required "[t]he detention of the person" and "[t]he unlawfulness of such detention." 3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *127 (George Sharswood ed., 1893). Other treatises similarly reiterated that "unlawful detention" served as the cornerstone of the tort of false imprisonment. WILLIAM C. ROBINSON, ELEMENTARY LAW § 219, at 132 (1882) ("False imprisonment is the unlawful detention of the person of another . . . . Such confinement or restraint is unlawful in every case where it is not expressly authorized by law." (emphasis omitted)); H. GERALD CHAPIN, HANDBOOK OF THE LAW OF TORTS § 64, at 273 (1917) ("False imprisonment consists in the unlawful detention of the person of another for any length of time, whereby he is deprived of

his personal liberty." (citation and internal quotation marks omitted)); RESTATEMENT (FIRST) OF TORTS § 35(1)(d) (AM. L. INST. 1934) (defining false imprisonment as "[a]n act which, directly or indirectly, is a legal cause of a confinement of another within boundaries fixed by the actor for any time, no matter how short in duration, makes the actor liable to the other . . . if," among other elements, *the confinement is not otherwise privileged*" (emphasis added)); 1 FOWLER V. HARPER & FLEMING JAMES, JR., THE LAW OF TORTS § 3.7, at 226 (1956) ("Thus, to confine one intentionally, without lawful privilege and against his consent within a limited area for any appreciable time, however short, constitutes the tort of false imprisonment.").

By contrast, neither of the more modern Restatements of Torts includes "unlawfulness" as an element. Under the Second Restatement of Torts, an "actor is subject to liability to another for false imprisonment" if he intends to "confine" another "within boundaries fixed by the actor," his act "results in such a confinement," and the confined person "is conscious of the confinement or is harmed by it." RESTATEMENT (SECOND) OF TORTS § 35 (AM. L. INST. 1965). The latest draft of the Third Restatement likewise omits unlawfulness from its cause of action. RESTATEMENT (THIRD) OF TORTS: INTENTIONAL TORTS TO PERSONS § 7 (AM. L. INST., Tentative Draft No. 3 2018). Under this regime, the lawfulness of the confinement amounts to a privilege—or a defense—asserted by the defendant, not an element of the tort. *Id.* § 9 reporters' note cmt. b ("In a . . . broad[] class of false-imprisonment cases, . . . the defendant will argue in court that a legal privilege to confine precludes

23-12476                Opinion of the Court                15

liability."); *see also* RESTATEMENT (SECOND) OF TORTS § 147 (describing a teacher's "privilege[] . . . to impose . . . reasonable confinement" upon a child "as he reasonably believes to be necessary for its proper control, training, or education"); *id.* § 156 ("One who is under a duty to protect a third person or his land or chattels . . . is privileged . . . to impose . . . [reasonable] restraint."); *id.* § 120A ("One who reasonably believes that another has tortiously taken a chattel upon his premises . . . is privileged . . . to detain him on the premises for the time necessary for a reasonable investigation of the facts.").

Tasked, as we are, by the Constitution to draw the "[b]oundaries" of the general maritime law, *The Thomas Barlum*, 293 U.S. at 43, we conclude that the tort of false imprisonment incorporates the element of unlawfulness. To state a claim for false imprisonment, a plaintiff must allege a willful detention without his consent and without lawful authority. This formula reflects the consensus of "traditional common-law rules, modifications of those rules, and newly created rules," *E. River S.S. Corp.*, 476 U.S. at 864–65, which treats the "unlawfulness" of the confinement as an element of the tort of false imprisonment. Our formulation also leaves room for the traditional role that privileges played at common law, as described in the Restatements. *See, e.g.*, RESTATEMENT (SECOND) OF TORTS §§ 120A, 147, 156. A plaintiff must plead, as an initial matter, that the defendant lacked lawful authority to confine him. And the defendant may respond that the detention was privileged.

Maglana and Bugayong fail to state a claim for the maritime tort of false imprisonment. Although their pleadings allege that Celebrity confined them to the ship without their consent, they fail to allege facts that would establish that Celebrity lacked the lawful authority to do so. Maglana and Bugayong cannot and do not contest that from March 14 (the day the Centers for Disease Control released the No Sail Order) to April 23 (the day the Centers for Disease Control released the repatriation guidance) Celebrity lacked the authority to release them from the ship. And they cannot and do not contest that from April 23 to May 26 Celebrity lacked the authority to release them until it could comply with the Centers for Disease Control's strict protocol. During that second period, Celebrity may have taken longer than Maglana and Bugayong would have liked to arrange private, chartered travel from California to the Philippines. But that span of time alone does not mean that Celebrity lacked the lawful authority to confine them.

Maglana and Bugayong's counterarguments fail to persuade us otherwise. To start, they halfheartedly frame the "lawfulness" of their confinement as an irrelevant consideration at the motion-to-dismiss stage. Under their telling, Celebrity's authority to detain them comes into play only as an "affirmative defense" to their claim for false imprisonment. As we explained above, this assertion is wrong as a matter of law. And, in any event, Maglana and Bugayong's briefs make clear that even they do not buy what they are selling. In both of their briefs, they repeatedly admit that the tort of false imprisonment places the onus on the plaintiff to establish, at least as an initial matter, the unlawfulness of the defendants'

conduct. *See, e.g.*, Appellants' Initial Brief at 10–11, *Maglana v. Celebrity Cruises Inc.*, No. 23-12476 (11th Cir. Feb. 22, 2024) ("The Plaintiff is required only to establish imprisonment contrary to his will and the unlawfulness of the detention." (citation omitted)); *id.* at 13 ("False imprisonment is the unlawful restraint of a person against his will, the gist of which action is the unlawful detention of the Plaintiff and the deprivation of his liberty." (citation and internal quotation marks omitted)); Reply Brief at 3, *Maglana v. Celebrity Cruises Inc.*, No. 23-12476 (11th Cir. June 5, 2024) ("The Plaintiff is required only to plead imprisonment contrary to his will and the unlawfulness of the detention." (citation and internal quotation marks omitted)); *id.* at 3–4 ("Thus, once Plaintiffs alleged that the detainment was without authority, any claim of lawfulness by Celebrity must be raised as an affirmative defense." (citation omitted)). After a plaintiff plausibly satisfies his burden, a defendant may then rebut that allegation by proving that the imprisonment was privileged. But as Maglana and Bugayong acknowledge, that burden shifting does not erase the plaintiffs' initial burden to allege the unlawfulness of the detention.

Maglana and Bugayong accuse Celebrity of filing a motion to dismiss that "argued its own set of facts." They point out that the motion argued that the "[a]mended [c]omplaint contain[ed] *absolutely no allegations* regarding when [t]he Philippines began permitting its citizens to reenter that country after having been aboard cruise ships." Maglana and Bugayong are correct that their amended complaint omitted any description of the Philippines' pandemic protocols and any barriers those protocols created for

cruise ships' repatriation efforts. And that omission means that Celebrity should not have relied on the Philippines' conduct to support the lawfulness of its own actions. But Maglana and Bugayong's argument is a non sequitur. The propriety of Celebrity's statement about the Philippines' protocols plays no role in our decision.

Last, Maglana and Bugayong maintain that they "did allege that their false imprisonment was unlawful." To prove their point, they cite a single statement in their amended complaint alleging that Celebrity violated its "legal obligations under the laws of this country, International law and the Maritime Labor Convention of 2006 and its amendments." From there, the amended complaint falls silent about which of those laws Celebrity allegedly violated. Indeed, the amended complaint does the opposite: it cites two orders from the Centers for Disease Control that establish the lawfulness of Celebrity's conduct. So Maglana and Bugayong's conclusory statement, without more, cannot establish that "their false imprisonment was unlawful."

### B. Maglana and Bugayong Failed to State a Claim for Intentional Infliction of Emotional Distress.

Maglana and Bugayong argue that the district court erred when it determined that they failed to state a claim for intentional infliction of emotional distress. We disagree. The district court did not err.

At least two federal circuit courts have held that the general maritime law recognizes the tort of intentional infliction of emotional distress. *Wallis v. Princess Cruises, Inc.*, 306 F.3d 827, 841 (9th

Cir. 2002); *Ellenwood v. Exxon Shipping Co.*, 984 F.2d 1270, 1283 n.23 (1st Cir. 1993). To fashion their rules of decision, both circuits looked to section 46 of the Second Restatement of Torts, which states that "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." *See Wallis*, 306 F.3d at 841; *Ellenwood*, 984 F.2d at 1283 n.23. The Restatement's comments elaborate that "it [is] not . . . enough that the defendant has acted with an intent which is tortious," "criminal," "intended to inflict emotional distress," or "even that his conduct has been characterized by 'malice.'" RESTATEMENT (SECOND) OF TORTS § 46 cmt. d. Instead, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*

We also look to section 46 of the Second Restatement of Torts, widely adopted by states as part of their common-law regimes, to set the terms for the tort of intentional infliction of emotional distress. *See, e.g.*, *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278–79 (Fla. 1985) (recognizing the tort of intentional infliction of emotional distress as defined by the Second Restatement); *Hosaflook v. Consolidation Coal Co.*, 497 S.E.2d 174, 184 & n.16 (W. Va. 1997) (same); *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991) (same); *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (Ariz. 1987) (same); *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 908 (Mich. 1985) (same). To state a claim for this intentional tort, a plaintiff in admiralty must allege that the wrongdoer's conduct was intentional or

reckless, that it was outrageous, and that it caused severe emotional distress.

Maglana and Bugayong fail to establish that Celebrity's conduct was outrageous—or "beyond all possible bounds of decency, . . . atrocious, and utterly intolerable in a civilized community." RESTATEMENT (SECOND) OF TORTS § 46 cmt. d. The No Sail Order prevented Celebrity from repatriating its Filipino crew for over half the time they remained confined on the ship. After the order lifted, Celebrity worked within the Centers for Disease Control's strict protocol to repatriate its crew. To be sure, the pandemic forced Maglana and Bugayong into an unenviable position: they were trapped for months on a cruise ship without guidance about when they might return home. But the pandemic also gave Celebrity the unenviable job of repatriating thousands of crewmen to their homes around the globe—all while making sure that none encountered a member of the public. And, like the seamen, Celebrity faced a rapidly evolving crisis and changing guidelines. That Celebrity did not do this difficult job perfectly or as quickly as Maglana and Bugayong would have liked does not mean that its behavior was outrageous.

## IV. CONCLUSION

We **AFFIRM** the order of dismissal.